## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Joseph Kovach,

              Plaintiff,

v.

Navient Solutions, Inc.,

              Defendant.

Civil Action No. 1:16-cv-02755-NYW

### AFFIDAVIT OF JOSEPH KOVACH

    I am the plaintiff in the above-captioned matter. I make this affidavit in support of my motion for summary judgment on my claims against Defendant Navient Solutions, Inc., as follows:

1. This affidavit is based on personal knowledge, and if called as a witness, I could and would testify competently to its contents.

2. I have a T-Mobile cellular telephone assigned the number 720-236-5587.

3. From no later than January 2014 through August 2015, I received repeated calls to my cellular phone from Defendant.

4. At all times while Defendant was calling me in 2014 and 2015, the cellular telephone was my personal telephone that I used every day and carried with me most or all of the time.

5. Defendant was calling the cellular phone to collect on two student loans I had taken out in 2007 to fund my distance-learning paralegal studies at Kaplan University.

6. When I answered the phone when Defendant called, the call would open with a pre-recorded voice, before terminating or a representative coming on the line.

1

7.   I knew Defendant was calling because when they called me or left me messages, their representatives would say they were calling from Defendant to "help" me pay down my account.

8.   I did my best to make payments when I could, but this was hard because I am blind and on a fixed income from Social Security.

9.   Sometimes, when Defendant called me before my Social Security check arrived, I would tell them I didn't have any money and told the representative to call me in a week or two.

10.   In late May 2015, Defendant called me before my check arrived. I told them to call back the following week.

11.   The next day, Defendant called me again. This made me frustrated and angry, because I had told them just the day before to call back a week later. So I told them to stop calling.

12.   Defendant continued to call me on my cellular telephone after this into August 2015. I could tell that it was Defendant calling because with each call, my phone would read out Defendant's phone number, and I got so many calls I came to recognize Defendant's phone number just from hearing it so many times.

13.   I found Defendant's calls aggravating, annoying, frustrating, harassing, and invasive, as whether I picked up the phone or not, my phone rang and read out Defendant's number.

I declare under penalty of perjury under the laws of the United States and the State of Colorado that the foregoing is true and correct. Executed at _Centennial_ (CITY), Colorado, on this _14_ day of _November_ 2017.


DATE: 11.14.17

Joseph Kovach

SIGN HERE

2

ININ 090 CRS

Outbound

| campaignname | siteid | i3_identity | i3_rowid | callid | callidkey |
|---|---|---|---|---|---|
| CRS_FFELP_ALL_AGL | CRS | 3.61796E+17 | 5.24217E+11 | 2400376404 | 240037640440150805 |
| CRS_FFELP_ALL_AGL | CRS | 3.61796E+17 | 5.24217E+11 | 0 | |
| CRS_FFELP_ALL_AGL | CRS | 3.61796E+17 | 5.24217E+11 | 3400093639 | 340009363940150806 |
| CRS_FFELP_ALL_AGL | CRS | 3.61796E+17 | 5.24217E+11 | 0 | |
| CRS_FFELP_ALL_AGL | CRS | 3.61796E+17 | 5.24217E+11 | 105150856 | 10515085624150808 |
| CRS_FFELP_ALL_AGL | CRS | 3.61796E+17 | 5.24217E+11 | 0 | |
| CRS_FFELP_ALL_AGL | CRS | 3.61796E+17 | 5.24217E+11 | 105559871 | 10555987124150810 |
| CRS_FFELP_ALL_AGL | CRS | 3.61796E+17 | 5.24217E+11 | 0 | |
| CRS_FFELP_ALL_AGL | CRS | 3.61796E+17 | 5.24217E+11 | 0 | |
| CRS_FFELP_ALL_AGL | CRS | 3.61796E+17 | 5.24217E+11 | 0 | |
| CRS_FFELP_ALL_AGL | CRS | 3.61796E+17 | 5.24217E+11 | 2400923542 | 240092354260150813 |
| CRS_FFELP_ALL_AGL | CRS | 3.61796E+17 | 5.24217E+11 | 0 | |
| CRS_FFELP_ALL_AGL | CRS | 3.61796E+17 | 5.24217E+11 | 0 | |
| CRS_FFELP_ALL_AGL | CRS | 3.61796E+17 | 5.24217E+11 | 105480631 | 10548063126150817 |
| CRS_FFELP_ALL_AGL | CRS | 3.61796E+17 | 5.24217E+11 | 105678898 | 10567889826150817 |
| CRS_FFELP_ALL_AGL | CRS | 3.61796E+17 | 5.24217E+11 | 0 | |
| CRS_FFELP_ALL_AGL | CRS | 3.61796E+17 | 5.24217E+11 | 0 | |
| CRS_FFELP_ALL | CRS | 3.61796E+17 | 5.24217E+11 | 0 | |
| CRS_FFELP_ALL | CRS | 3.61796E+17 | 5.24217E+11 | 3400590608 | 340059060860150821 |
| CRS_FFELP_ALL | CRS | 3.61796E+17 | 5.24217E+11 | 0 | |
| CRS_FFELP_ALL | CRS | 3.61796E+17 | 5.24217E+11 | 105222313 | 10522231326150824 |
| CRS_FFELP_ALL | CRS | 3.61796E+17 | 5.24217E+11 | 105552423 | 10555242326150824 |
| CRS_FFELP_ALL | CRS | 3.61796E+17 | 5.24217E+11 | 105833253 | 10583325326150825 |
| CRS_FFELP_ALL | CRS | 3.61796E+17 | 5.24217E+11 | 0 | |
| CRS_FFELP_ALL | CRS | 3.61796E+17 | 5.24217E+11 | 0 | |
| CRS_FFELP_ALL | CRS | 3.61796E+17 | 5.24217E+11 | 0 | |
| CRS_FFELP_ALL | CRS | 3.61796E+17 | 5.24217E+11 | 1400860921 | 140086092160150826 |
| CRS_FFELP_ALL | CRS | 3.61796E+17 | 5.24217E+11 | 2400099052 | 240009905260150827 |

Movant's Appendix 3

| wrapupcategory | wrapupcode | callingmode | phonenumber | phonenumbertype |
|---|---|---|---|---|
| Remote Hang Up | Remote Hang Up in Attendant | 8 | ██ 5587 | ph_cell_01 |
| No Answer | No Answer | 8 | ██ 5587 | ph_cell_01 |
| Remote Hang Up | Remote Hang Up in Attendant | 8 | ██ 5587 | ph_cell_01 |
| No Answer | No Answer | 8 | ██ 5587 | ph_cell_01 |
| Remote Hang Up | Remote Hang Up | 8 | ██ 5587 | ph_cell_01 |
| No Answer | No Answer | 8 | ██ 5587 | ph_cell_01 |
| Remote Hang Up | Remote Hang Up in Attendant | 8 | ██ 5587 | ph_cell_01 |
| No Answer | No Answer | 8 | ██ 5587 | ph_cell_01 |
| No Answer | No Answer | 8 | ██ 5587 | ph_cell_01 |
| No Answer | No Answer | 8 | ██ 5587 | ph_cell_01 |
| Remote Hang Up | Remote Hang Up | 8 | ██ 5587 | ph_cell_01 |
| No Answer | No Answer | 8 | ██ 5587 | ph_cell_01 |
| No Answer | No Answer | 8 | ██ 5587 | ph_cell_01 |
| No Answer | No Answer | 8 | ██ 5587 | ph_cell_01 |
| Remote Hang Up | Remote Hang Up in Attendant | 8 | ██ 5587 | ph_cell_01 |
| Remote Hang Up | Remote Hang Up in Attendant | 8 | ██ 5587 | ph_cell_01 |
| No Answer | No Answer | 8 | ██ 5587 | ph_cell_01 |
| No Answer | No Answer | 8 | ██ 5587 | ph_cell_01 |
| No Answer | No Answer | 1 | ██ 5587 | ph_cell_01 |
| No Answer | CRS - No Answer | 1 | ██ 5587 | ph_cell_01 |
| No Answer | No Answer | 1 | ██ 5587 | ph_cell_01 |
| No Answer | No Answer | 1 | ██ 5587 | ph_cell_01 |
| No Answer | CRS - No Answer | 1 | ██ 5587 | ph_cell_01 |
| Third Party Uncallable | CRS - Third Party - Left Message | 1 | ██ 5587 | ph_cell_01 |
| Answering Machine Uncallable | CRS - Answering Machine - Left Message | 1 | ██ 5587 | ph_cell_01 |
| SIT Callable | SIT Callable - No Circuit | 1 | ██ 5587 | ph_cell_01 |
| No Answer | No Answer | 1 | ██ 5587 | ph_cell_01 |
| No Answer | No Answer | 1 | ██ 5587 | ph_cell_01 |
| Third Party Callable | CRS - Third Party - Party Hang Up | 1 | ██ 5587 | ph_cell_01 |
| Third Party Callable | CRS - Third Party - Party Hang Up | 1 | ██ 5587 | ph_cell_01 |

NSI000032

| agentid | calledpartyoffset | odsoffset | previewpoptimeUTC | callplacedtimeUTC | callansweredtimeUTC |
|---|---|---|---|---|---|
| | -21600 | -14400 | 1/1/1970 | 8/5/2015 2:11:31 PM | 8/5/2015 2:11:59 PM |
| | -21600 | -14400 | 1/1/1970 | 8/6/2015 2:02:19 PM | 8/6/2015 2:02:49 PM |
| | -21600 | -14400 | 1/1/1970 | 8/6/2015 5:13:41 PM | 8/6/2015 5:13:56 PM |
| | -21600 | -14400 | 1/1/1970 | 8/8/2015 2:01:57 PM | 8/8/2015 2:02:28 PM |
| | -21600 | -14400 | 1/1/1970 | 8/8/2015 4:59:20 PM | 8/8/2015 4:59:54 PM |
| | -21600 | -14400 | 1/1/1970 | 8/10/2015 2:03:13 PM | 8/10/2015 2:03:44 PM |
| | -21600 | -14400 | 1/1/1970 | 8/10/2015 5:19:25 PM | 8/10/2015 5:19:41 PM |
| | -21600 | -14400 | 1/1/1970 | 8/11/2015 4:05:32 PM | 8/11/2015 4:06:04 PM |
| | -21600 | -14400 | 1/1/1970 | 8/12/2015 5:04:41 PM | 8/12/2015 5:05:16 PM |
| | -21600 | -14400 | 1/1/1970 | 8/13/2015 2:28:49 PM | 8/13/2015 2:29:20 PM |
| | -21600 | -14400 | 1/1/1970 | 8/13/2015 5:29:29 PM | 8/13/2015 5:29:55 PM |
| | -21600 | -14400 | 1/1/1970 | 8/14/2015 4:13:13 PM | 8/14/2015 4:13:44 PM |
| | -21600 | -14400 | 1/1/1970 | 8/15/2015 2:02:12 PM | 8/15/2015 2:02:45 PM |
| | -21600 | -14400 | 1/1/1970 | 8/15/2015 4:56:02 PM | 8/15/2015 4:56:33 PM |
| | -21600 | -14400 | 1/1/1970 | 8/17/2015 2:27:22 PM | 8/17/2015 2:27:40 PM |
| | -21600 | -14400 | 1/1/1970 | 8/17/2015 5:09:34 PM | 8/17/2015 5:09:51 PM |
| | -21600 | -14400 | 1/1/1970 | 8/19/2015 2:35:27 PM | 8/19/2015 2:36:00 PM |
| | -21600 | -14400 | 1/1/1970 | 8/20/2015 2:02:22 PM | 8/20/2015 2:02:53 PM |
| | -21600 | -14400 | 1/1/1970 | 8/21/2015 2:08:13 PM | 8/21/2015 2:08:51 PM |
| c57188 | -21600 | -14400 | 1/1/1970 | 8/21/2015 6:37:07 PM | 8/21/2015 6:37:39 PM |
| | -21600 | -14400 | 1/1/1970 | 8/21/2015 8:59:52 PM | 8/21/2015 9:00:30 PM |
| | -21600 | -14400 | 1/1/1970 | 8/22/2015 2:07:41 PM | 8/22/2015 2:08:24 PM |
| c57197 | -21600 | -14400 | 1/1/1970 | 8/24/2015 2:12:24 PM | 8/24/2015 2:13:03 PM |
| c55369 | -21600 | -14400 | 1/1/1970 | 8/24/2015 9:05:51 PM | 8/24/2015 9:06:13 PM |
| c49240 | -21600 | -14400 | 1/1/1970 | 8/25/2015 2:51:56 PM | 8/25/2015 2:52:31 PM |
| | -21600 | -14400 | 1/1/1970 | 8/26/2015 2:16:10 PM | 8/26/2015 2:17:03 PM |
| | -21600 | -14400 | 1/1/1970 | 8/26/2015 8:16:10 PM | 8/26/2015 8:17:05 PM |
| | -21600 | -14400 | 1/1/1970 | 8/26/2015 9:31:33 PM | 8/26/2015 9:32:24 PM |
| c51130 | -21600 | -14400 | 1/1/1970 | 8/26/2015 10:55:39 PM | 8/26/2015 10:55:58 PM |
| c48775 | -21600 | -14400 | 1/1/1970 | 8/27/2015 2:21:14 PM | 8/27/2015 2:21:43 PM |

NSI000033

| messageplaytimeUTC | callconnectedtimeUTC | calldisconnectedtimeUTC | length | caresult | isabandoned | iscontact |
|---|---|---|---|---|---|---|
| 1/1/1970 | 1/1/1970 | 8/5/2015 2:12:10 PM | 158 | 1 | TRUE | FALSE |
| 1/1/1970 | 1/1/1970 | 8/6/2015 2:02:49 PM | 30 | 5 | FALSE | FALSE |
| 1/1/1970 | 1/1/1970 | 8/6/2015 5:14:12 PM | 151 | 1 | TRUE | FALSE |
| 1/1/1970 | 1/1/1970 | 8/8/2015 2:02:28 PM | 30 | 5 | FALSE | FALSE |
| 1/1/1970 | 1/1/1970 | 8/8/2015 4:59:56 PM | 35 | 4 | FALSE | FALSE |
| 1/1/1970 | 1/1/1970 | 8/10/2015 2:03:44 PM | 31 | 5 | FALSE | FALSE |
| 1/1/1970 | 1/1/1970 | 8/10/2015 5:19:48 PM | 142 | 1 | TRUE | FALSE |
| 1/1/1970 | 1/1/1970 | 8/11/2015 4:06:04 PM | 31 | 5 | FALSE | FALSE |
| 1/1/1970 | 1/1/1970 | 8/12/2015 5:05:16 PM | 34 | 5 | FALSE | FALSE |
| 1/1/1970 | 1/1/1970 | 8/13/2015 2:29:20 PM | 31 | 5 | FALSE | FALSE |
| 1/1/1970 | 1/1/1970 | 8/13/2015 5:30:44 PM | 74 | 4 | FALSE | FALSE |
| 1/1/1970 | 1/1/1970 | 8/14/2015 4:13:44 PM | 30 | 5 | FALSE | FALSE |
| 1/1/1970 | 1/1/1970 | 8/15/2015 2:02:46 PM | 32 | 5 | FALSE | FALSE |
| 1/1/1970 | 1/1/1970 | 8/15/2015 4:56:33 PM | 31 | 5 | FALSE | FALSE |
| 1/1/1970 | 1/1/1970 | 8/17/2015 2:27:47 PM | 144 | 1 | TRUE | FALSE |
| 1/1/1970 | 1/1/1970 | 8/17/2015 5:09:58 PM | 144 | 1 | TRUE | FALSE |
| 1/1/1970 | 1/1/1970 | 8/19/2015 2:36:00 PM | 32 | 5 | FALSE | FALSE |
| 1/1/1970 | 1/1/1970 | 8/20/2015 2:02:53 PM | 30 | 5 | FALSE | FALSE |
| 1/1/1970 | 1/1/1970 | 8/21/2015 2:08:51 PM | 37 | 5 | FALSE | FALSE |
| 1/1/1970 | 8/21/2015 6:37:39 PM | 8/21/2015 6:37:43 PM | 43 | 1 | FALSE | FALSE |
| 1/1/1970 | 1/1/1970 | 8/21/2015 9:00:30 PM | 38 | 5 | FALSE | FALSE |
| 1/1/1970 | 1/1/1970 | 8/22/2015 2:08:24 PM | 43 | 5 | FALSE | FALSE |
| 1/1/1970 | 8/24/2015 2:13:03 PM | 8/24/2015 2:13:07 PM | 56 | 1 | FALSE | FALSE |
| 1/1/1970 | 8/24/2015 9:06:13 PM | 8/24/2015 9:07:30 PM | 113 | 1 | FALSE | FALSE |
| 1/1/1970 | 8/25/2015 2:52:31 PM | 8/25/2015 2:52:57 PM | 61 | 1 | FALSE | FALSE |
| 1/1/1970 | 1/1/1970 | 8/26/2015 2:17:03 PM | 53 | 5 | FALSE | FALSE |
| 1/1/1970 | 1/1/1970 | 8/26/2015 8:17:05 PM | 54 | 5 | FALSE | FALSE |
| 1/1/1970 | 1/1/1970 | 8/26/2015 9:32:24 PM | 51 | 5 | FALSE | FALSE |
| 1/1/1970 | 8/26/2015 10:55:58 PM | 8/26/2015 10:56:39 PM | 59 | 1 | FALSE | FALSE |
| 1/1/1970 | 8/27/2015 2:21:43 PM | 8/27/2015 2:22:33 PM | 103 | 1 | FALSE | FALSE |

| isdetect | isrpc | issuccess | customdata1 | customdata2 | campaignfilterid | ArchiveDateTime |
|---|---|---|---|---|---|---|
| TRUE | FALSE | FALSE | 42219.27823 | P_W_WX_Y__CO_1_00 | | 45 2015-12-03T19:08:22.56-05:00 |
| FALSE | FALSE | FALSE | 42220.27875 | P_W_WX_Y__CO_1_00 | | 45 2015-12-04T19:10:56.803-05:00 |
| TRUE | FALSE | FALSE | 42220.27875 | P_W_WX_Y__CO_1_00 | | 45 2015-12-04T19:07:49.22-05:00 |
| FALSE | FALSE | FALSE | 42222.28335 | P_W_WX_Y__CO_1_00 | | 45 2015-12-06T19:06:18.25-05:00 |
| FALSE | FALSE | FALSE | 42222.28335 | P_W_WX_Y__CO_1_00 | | 45 2015-12-06T19:07:15.383-05:00 |
| FALSE | FALSE | FALSE | 42224.2787 | P_W_WX_Y__CO_1_00 | | 45 2015-12-08T19:05:31.51-05:00 |
| TRUE | FALSE | FALSE | 42224.2787 | P_W_WX_Y__CO_1_00 | | 45 2015-12-08T19:06:59.15-05:00 |
| FALSE | FALSE | FALSE | 42225.29292 | P_W_WX_Y__CO_1_00 | | 45 2015-12-09T19:10:10.653-05:00 |
| FALSE | FALSE | FALSE | 42226.27843 | P_W_WX_Y__CO_1_00 | | 45 2015-12-10T19:09:03.34-05:00 |
| FALSE | FALSE | FALSE | 42227.2796 | P_W_WX_Y__CO_1_00 | | 45 2015-12-11T19:11:18.16-05:00 |
| FALSE | FALSE | FALSE | 42227.2796 | P_W_WX_Y__CO_1_00 | | 45 2015-12-11T19:07:18.253-05:00 |
| FALSE | FALSE | FALSE | 42228.27809 | P_W_WX_Y__CO_1_00 | | 45 2015-12-12T19:14:59.807-05:00 |
| FALSE | FALSE | FALSE | 42229.27837 | P_W_WX_Y__CO_1_00 | | 45 2015-12-13T19:07:00.49-05:00 |
| FALSE | FALSE | FALSE | 42229.27837 | P_W_WX_Y__CO_1_00 | | 45 2015-12-13T19:07:59.847-05:00 |
| TRUE | FALSE | FALSE | 42231.32891 | P_W_WX_Y__CO_1_00 | | 45 2015-12-15T19:05:19.107-05:00 |
| TRUE | FALSE | FALSE | 42231.32891 | P_W_WX_Y__CO_1_00 | | 45 2015-12-15T19:03:48.263-05:00 |
| FALSE | FALSE | FALSE | 42233.27871 | P_W_WX_Y__CO_1_00 | | 45 2015-12-17T19:11:37.017-05:00 |
| FALSE | FALSE | FALSE | 42234.27858 | P_W_WX_Y__CO_1_00 | | 45 2015-12-18T19:05:55.91-05:00 |
| FALSE | FALSE | FALSE | 42235.27914 | P_W_WX_Y__CO_1_00 | | 54 2015-12-19T19:12:57.273-05:00 |
| TRUE | FALSE | FALSE | 42235.27914 | P_W_WX_Y__CO_1_00 | | 54 2015-12-19T19:13:49.353-05:00 |
| FALSE | FALSE | FALSE | 42235.27914 | P_W_WX_Y__CO_1_00 | | 54 2015-12-20T19:05:23.73-05:00 |
| FALSE | FALSE | FALSE | 42236.27927 | P_W_WX_Y__CO_1_00 | | 54 2015-12-20T19:06:37.823-05:00 |
| TRUE | FALSE | FALSE | 42238.27917 | P_W_WX_Y__CO_1_00 | | 54 2015-12-22T19:06:41.44-05:00 |
| TRUE | FALSE | FALSE | 42238.27917 | P_W_WX_Y__CO_1_00 | | 54 2015-12-23T19:05:09.773-05:00 |
| TRUE | FALSE | FALSE | 42239.27946 | P_W_WX_Y__CO_1_00 | | 54 2015-12-23T19:03:44.77-05:00 |
| FALSE | FALSE | FALSE | 42240.27903 | P_W_WX_Y__CO_1_00 | | 54 2015-12-24T19:10:37.047-05:00 |
| FALSE | FALSE | FALSE | 42240.27903 | P_W_WX_Y__CO_1_00 | | 54 2015-12-25T19:07:00.56-05:00 |
| FALSE | FALSE | FALSE | 42240.27903 | P_W_WX_Y__CO_1_00 | | 54 2015-12-25T19:07:27.73-05:00 |
| TRUE | FALSE | FALSE | 42240.27903 | P_W_WX_Y__CO_1_00 | | 54 2015-12-25T19:02:58.82-05:00 |
| TRUE | FALSE | FALSE | 42241.27943 | P_W_WX_Y__CO_1_00 | | 54 2015-12-25T19:05:23.793-05:00 |

NSI000035

| cadetail | previewtimerinit |
|---|---|
| Normal Call Clearing (ISDN Cause Code 16) | |
| No Channel available (ISDN Cause Code 34) | |
| Normal Call Clearing (ISDN Cause Code 16) | |
| No Channel available (ISDN Cause Code 34) | |
| Normal Call Clearing (ISDN Cause Code 16) | |
| Normal Call Clearing (ISDN Cause Code 16) | |
| Normal Call Clearing (ISDN Cause Code 16) | |
| No Channel available (ISDN Cause Code 34) | |
| Normal Call Clearing (ISDN Cause Code 16) | |
| No Channel available (ISDN Cause Code 34) | |
| No Channel available (ISDN Cause Code 34) | |
| Normal Call Clearing (ISDN Cause Code 16) | |
| No Channel available (ISDN Cause Code 34) | |
| No Channel available (ISDN Cause Code 34) | |
| Normal Call Clearing (ISDN Cause Code 16) | |
| Normal Call Clearing (ISDN Cause Code 16) | |
| No Channel available (ISDN Cause Code 34) | |

NSI000036

ININ 090 CRS
Outbound

| campaignname | siteid | i3_identity | i3_rowid | callid | callidkey | wrapupcategory | wrapupcode | calling mode | phonenumber | phonenumbertype | agentid | calledpartyoffset | odsoffset | previewoptimeUTC | callplacedtimeUTC | callansweredtimeUTC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CRS_FFELP_ALL | CRS | 3.61796E+17 | 5.24217E+11 | 1400899148 | 140089914880150528 | Third Party Uncallable | CRS - Third Party - Left Message | 1 | 5587 | ph_cell_01 | c49061 | -21600 | -14400 | 1/1/1970 | 5/28/2015 3:45:19 PM | 5/28/2015 3:45:49 PM |
| CRS_FFELP_ALL | CRS | 3.61796E+17 | 5.24217E+11 | 105432160 | 1054321602A150603 | Third Party Callable | CRS - Third party - No Message | 1 | 5587 | ph_cell_01 | c49070 | -21600 | -14400 | 1/1/1970 | 6/3/2015 8:34:09 PM | 6/3/2015 8:34:35 PM |
| CRS_FFELP_ALL_AGL | CRS | 3.61796E+17 | 5.24217E+11 | 2400376404 | 240037640440150805 | Remote Hang Up | Remote Hang Up in Attendant | 8 | 5587 | ph_cell_01 | | -21600 | -14400 | 1/1/1970 | 8/5/2015 2:11:31 PM | 8/5/2015 2:11:59 PM |
| CRS_FFELP_ALL_AGL | CRS | 3.61796E+17 | 5.24217E+11 | 0 | | No Answer | No Answer | 8 | 5587 | ph_cell_01 | | -21600 | -14400 | 1/1/1970 | 8/6/2015 2:02:19 PM | 8/6/2015 2:02:49 PM |
| CRS_FFELP_ALL_AGL | CRS | 3.61796E+17 | 5.24217E+11 | 3400093639 | 340009363940150806 | Remote Hang Up | Remote Hang Up in Attendant | 8 | 5587 | ph_cell_01 | | -21600 | -14400 | 1/1/1970 | 8/6/2015 5:13:41 PM | 8/6/2015 5:13:56 PM |
| CRS_FFELP_ALL_AGL | CRS | 3.61796E+17 | 5.24217E+11 | 0 | | No Answer | No Answer | 8 | 5587 | ph_cell_01 | | -21600 | -14400 | 1/1/1970 | 8/8/2015 2:01:57 PM | 8/8/2015 2:02:28 PM |
| CRS_FFELP_ALL_AGL | CRS | 3.61796E+17 | 5.24217E+11 | 105150856 | 10515085624150808 | Remote Hang Up | Remote Hang Up | 8 | 5587 | ph_cell_01 | | -21600 | -14400 | 1/1/1970 | 8/8/2015 4:59:20 PM | 8/8/2015 4:59:37 PM |
| CRS_FFELP_ALL_AGL | CRS | 3.61796E+17 | 5.24217E+11 | 0 | | No Answer | No Answer | 8 | 5587 | ph_cell_01 | | -21600 | -14400 | 1/1/1970 | 8/10/2015 2:03:13 PM | 8/10/2015 2:03:44 PM |
| CRS_FFELP_ALL_AGL | CRS | 3.61796E+17 | 5.24217E+11 | 105559871 | 10555987124150810 | Remote Hang Up | Remote Hang Up in Attendant | 8 | 5587 | ph_cell_01 | | -21600 | -14400 | 1/1/1970 | 8/10/2015 5:19:25 PM | 8/10/2015 5:19:41 PM |
| CRS_FFELP_ALL_AGL | CRS | 3.61796E+17 | 5.24217E+11 | 0 | | No Answer | No Answer | 8 | 5587 | ph_cell_01 | | -21600 | -14400 | 1/1/1970 | 8/11/2015 4:05:32 PM | 8/11/2015 4:06:03 PM |
| CRS_FFELP_ALL_AGL | CRS | 3.61796E+17 | 5.24217E+11 | 0 | | No Answer | No Answer | 8 | 5587 | ph_cell_01 | | -21600 | -14400 | 1/1/1970 | 8/12/2015 5:04:41 PM | 8/12/2015 5:05:16 PM |
| CRS_FFELP_ALL_AGL | CRS | 3.61796E+17 | 5.24217E+11 | 0 | | No Answer | No Answer | 8 | 5587 | ph_cell_01 | | -21600 | -14400 | 1/1/1970 | 8/13/2015 2:28:49 PM | 8/13/2015 2:29:20 PM |
| CRS_FFELP_ALL_AGL | CRS | 3.61796E+17 | 5.24217E+11 | 2400923542 | 240092354260150813 | Remote Hang Up | Remote Hang Up | 8 | 5587 | ph_cell_01 | | -21600 | -14400 | 1/1/1970 | 8/13/2015 5:29:29 PM | 8/13/2015 5:29:55 PM |
| CRS_FFELP_ALL_AGL | CRS | 3.61796E+17 | 5.24217E+11 | 0 | | No Answer | No Answer | 8 | 5587 | ph_cell_01 | | -21600 | -14400 | 1/1/1970 | 8/14/2015 4:13:13 PM | 8/14/2015 4:13:44 PM |
| CRS_FFELP_ALL_AGL | CRS | 3.61796E+17 | 5.24217E+11 | 0 | | No Answer | No Answer | 8 | 5587 | ph_cell_01 | | -21600 | -14400 | 1/1/1970 | 8/15/2015 2:02:12 PM | 8/15/2015 2:02:45 PM |
| CRS_FFELP_ALL_AGL | CRS | 3.61796E+17 | 5.24217E+11 | 0 | | No Answer | No Answer | 8 | 5587 | ph_cell_01 | | -21600 | -14400 | 1/1/1970 | 8/15/2015 4:56:02 PM | 8/15/2015 4:56:33 PM |
| CRS_FFELP_ALL_AGL | CRS | 3.61796E+17 | 5.24217E+11 | 105480631 | 10548063126150817 | Remote Hang Up | Remote Hang Up in Attendant | 8 | 5587 | ph_cell_01 | | -21600 | -14400 | 1/1/1970 | 8/17/2015 2:27:22 PM | 8/17/2015 2:27:40 PM |
| CRS_FFELP_ALL_AGL | CRS | 3.61796E+17 | 5.24217E+11 | 105678898 | 10567889826150817 | Remote Hang Up | Remote Hang Up in Attendant | 8 | 5587 | ph_cell_01 | | -21600 | -14400 | 1/1/1970 | 8/17/2015 5:09:34 PM | 8/17/2015 5:09:51 PM |
| CRS_FFELP_ALL_AGL | CRS | 3.61796E+17 | 5.24217E+11 | 0 | | No Answer | No Answer | 8 | 5587 | ph_cell_01 | | -21600 | -14400 | 1/1/1970 | 8/19/2015 2:35:27 PM | 8/19/2015 2:36:00 PM |
| CRS_FFELP_ALL_AGL | CRS | 3.61796E+17 | 5.24217E+11 | 0 | | No Answer | No Answer | 8 | 5587 | ph_cell_01 | | -21600 | -14400 | 1/1/1970 | 8/20/2015 2:02:22 PM | 8/20/2015 2:02:53 PM |
| CRS_FFELP_ALL | CRS | 3.61796E+17 | 5.24217E+11 | 0 | | No Answer | No Answer | 1 | 5587 | ph_cell_01 | | -21600 | -14400 | 1/1/1970 | 8/21/2015 2:08:13 PM | 8/21/2015 2:08:51 PM |
| CRS_FFELP_ALL | CRS | 3.61796E+17 | 5.24217E+11 | 3400590608 | 340059060860150821 | No Answer | CRS - No Answer | 1 | 5587 | ph_cell_01 | c57188 | -21600 | -14400 | 1/1/1970 | 8/21/2015 6:37:07 PM | 8/21/2015 6:37:39 PM |
| CRS_FFELP_ALL | CRS | 3.61796E+17 | 5.24217E+11 | 0 | | No Answer | No Answer | 1 | 5587 | ph_cell_01 | | -21600 | -14400 | 1/1/1970 | 8/21/2015 8:59:52 PM | 8/21/2015 9:00:30 PM |
| CRS_FFELP_ALL | CRS | 3.61796E+17 | 5.24217E+11 | 0 | | No Answer | No Answer | 1 | 5587 | ph_cell_01 | | -21600 | -14400 | 1/1/1970 | 8/22/2015 2:07:41 PM | 8/22/2015 2:08:24 PM |
| CRS_FFELP_ALL | CRS | 3.61796E+17 | 5.24217E+11 | 105222313 | 10522231326150824 | No Answer | CRS - No Answer | 1 | 5587 | ph_cell_01 | c57197 | -21600 | -14400 | 1/1/1970 | 8/24/2015 2:12:24 PM | 8/24/2015 2:13:03 PM |
| CRS_FFELP_ALL | CRS | 3.61796E+17 | 5.24217E+11 | 105552423 | 10555242326150824 | Third Party Uncallable | CRS - Third Party - Left Message | 1 | 5587 | ph_cell_01 | c55369 | -21600 | -14400 | 1/1/1970 | 8/24/2015 9:05:51 PM | 8/24/2015 9:06:13 PM |
| CRS_FFELP_ALL | CRS | 3.61796E+17 | 5.24217E+11 | 105833253 | 10583325326150825 | Answering Machine Uncallable | CRS - Answering Machine - Left Message | 1 | 5587 | ph_cell_01 | c49240 | -21600 | -14400 | 1/1/1970 | 8/25/2015 2:51:56 PM | 8/25/2015 2:52:31 PM |
| CRS_FFELP_ALL | CRS | 3.61796E+17 | 5.24217E+11 | 0 | | SIT Callable | SIT Callable - No Circuit | 1 | 5587 | ph_cell_01 | | -21600 | -14400 | 1/1/1970 | 8/26/2015 2:16:10 PM | 8/26/2015 2:17:03 PM |
| CRS_FFELP_ALL | CRS | 3.61796E+17 | 5.24217E+11 | 0 | | No Answer | No Answer | 1 | 5587 | ph_cell_01 | | -21600 | -14400 | 1/1/1970 | 8/26/2015 8:16:10 PM | 8/26/2015 8:17:05 PM |
| CRS_FFELP_ALL | CRS | 3.61796E+17 | 5.24217E+11 | 0 | | No Answer | No Answer | 1 | 5587 | ph_cell_01 | | -21600 | -14400 | 1/1/1970 | 8/26/2015 9:31:33 PM | 8/26/2015 9:32:24 PM |
| CRS_FFELP_ALL | CRS | 3.61796E+17 | 5.24217E+11 | 1400860921 | 140086092160150826 | Third Party Callable | CRS - Third Party - Party Hang Up | 1 | 5587 | ph_cell_01 | c51130 | -21600 | -14400 | 1/1/1970 | 8/26/2015 10:55:39 PM | 8/26/2015 10:55:58 PM |
| CRS_FFELP_ALL | CRS | 3.61796E+17 | 5.24217E+11 | 2400099052 | 240009905260150827 | Third Party Callable | CRS - Third Party - Party Hang Up | 1 | 5587 | ph_cell_01 | c48775 | -21600 | -14400 | 1/1/1970 | 8/27/2015 2:21:14 PM | 8/27/2015 2:21:43 PM |

NSL000047

| messageplaytimeUTC | callconnectedtimeUTC | calldisconnectedtimeUTC | length | caresult | isabandoned | iscontact | isdetect | isrpc | issuccess | customdata1 | customdata2 | campaignfilterid | ArchiveDateTime | cadetail | previewtimemerinit |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1/1/1970 | 5/28/2015 3:45:49 PM | 5/28/2015 3:46:28 PM | 72 | 1 | FALSE | FALSE | TRUE | FALSE | FALSE | 42150.27964 | P_W_WX_Y__CO_1_00 | 54 | 2015-09-25T19:04:50.61-04:00 | | |
| 1/1/1970 | 6/3/2015 8:34:35 PM | 6/3/2015 8:35:05 PM | 90 | 1 | FALSE | FALSE | TRUE | FALSE | FALSE | 42156.27905 | P_W_WX_Y__CO_1_00 | 54 | 2015-10-02T19:01:37.553-04:00 | | |
| 1/1/1970 | 1/1/1970 | 8/5/2015 2:12:10 PM | 158 | 1 | TRUE | FALSE | TRUE | FALSE | FALSE | 42219.27823 | P_W_WX_Y__CO_1_00 | 45 | 2015-12-03T19:08:22.56-05:00 | | |
| 1/1/1970 | 1/1/1970 | 8/6/2015 2:02:49 PM | 30 | 5 | FALSE | FALSE | FALSE | FALSE | FALSE | 42220.27875 | P_W_WX_Y__CO_1_00 | 45 | 2015-12-04T19:10:56.803-05:00 | Normal Call Clearing (ISDN Cause Code 16) | |
| 1/1/1970 | 1/1/1970 | 8/6/2015 5:14:12 PM | 151 | 1 | TRUE | FALSE | TRUE | FALSE | FALSE | 42220.27875 | P_W_WX_Y__CO_1_00 | 45 | 2015-12-04T19:07:49.22-05:00 | | |
| 1/1/1970 | 1/1/1970 | 8/8/2015 2:02:28 PM | 30 | 5 | FALSE | FALSE | FALSE | FALSE | FALSE | 42222.28335 | P_W_WX_Y__CO_1_00 | 45 | 2015-12-06T19:06:18.25-05:00 | No Channel available (ISDN Cause Code 34) | |
| 1/1/1970 | 1/1/1970 | 8/8/2015 4:59:56 PM | 35 | 4 | FALSE | FALSE | FALSE | FALSE | FALSE | 42222.28335 | P_W_WX_Y__CO_1_00 | 45 | 2015-12-06T19:07:15.383-05:00 | | |
| 1/1/1970 | 1/1/1970 | 8/10/2015 2:03:44 PM | 31 | 5 | FALSE | FALSE | FALSE | FALSE | FALSE | 42224.2787 | P_W_WX_Y__CO_1_00 | 45 | 2015-12-08T19:05:31.51-05:00 | Normal Call Clearing (ISDN Cause Code 16) | |
| 1/1/1970 | 1/1/1970 | 8/10/2015 5:19:48 PM | 142 | 1 | TRUE | FALSE | TRUE | FALSE | FALSE | 42224.2787 | P_W_WX_Y__CO_1_00 | 45 | 2015-12-08T19:06:59.15-05:00 | | |
| 1/1/1970 | 1/1/1970 | 8/11/2015 4:06:04 PM | 31 | 5 | FALSE | FALSE | FALSE | FALSE | FALSE | 42225.29292 | P_W_WX_Y__CO_1_00 | 45 | 2015-12-09T19:10:10.653-05:00 | No Channel available (ISDN Cause Code 34) | |
| 1/1/1970 | 1/1/1970 | 8/12/2015 5:05:16 PM | 34 | 5 | FALSE | FALSE | FALSE | FALSE | FALSE | 42226.27843 | P_W_WX_Y__CO_1_00 | 45 | 2015-12-10T19:09:03.34-05:00 | Normal Call Clearing (ISDN Cause Code 16) | |
| 1/1/1970 | 1/1/1970 | 8/13/2015 2:29:20 PM | 31 | 5 | FALSE | FALSE | FALSE | FALSE | FALSE | 42227.2796 | P_W_WX_Y__CO_1_00 | 45 | 2015-12-11T19:11:18.16-05:00 | Normal Call Clearing (ISDN Cause Code 16) | |
| 1/1/1970 | 1/1/1970 | 8/13/2015 5:30:44 PM | 74 | 4 | FALSE | FALSE | FALSE | FALSE | FALSE | 42227.2796 | P_W_WX_Y__CO_1_00 | 45 | 2015-12-11T19:07:18.253-05:00 | | |
| 1/1/1970 | 1/1/1970 | 8/14/2015 4:13:44 PM | 30 | 5 | FALSE | FALSE | FALSE | FALSE | FALSE | 42228.27809 | P_W_WX_Y__CO_1_00 | 45 | 2015-12-12T19:14:59.807-05:00 | Normal Call Clearing (ISDN Cause Code 16) | |
| 1/1/1970 | 1/1/1970 | 8/15/2015 2:02:46 PM | 32 | 5 | FALSE | FALSE | FALSE | FALSE | FALSE | 42229.27837 | P_W_WX_Y__CO_1_00 | 45 | 2015-12-13T19:07:00.49-05:00 | No Channel available (ISDN Cause Code 34) | |
| 1/1/1970 | 1/1/1970 | 8/15/2015 4:56:33 PM | 31 | 5 | FALSE | FALSE | FALSE | FALSE | FALSE | 42229.27837 | P_W_WX_Y__CO_1_00 | 45 | 2015-12-13T19:07:59.847-05:00 | Normal Call Clearing (ISDN Cause Code 16) | |
| 1/1/1970 | 1/1/1970 | 8/17/2015 2:27:47 PM | 144 | 1 | FALSE | FALSE | TRUE | FALSE | FALSE | 42231.32891 | P_W_WX_Y__CO_1_00 | 45 | 2015-12-15T19:19:107-05:00 | | |
| 1/1/1970 | 1/1/1970 | 8/17/2015 5:09:58 PM | 144 | 1 | TRUE | FALSE | TRUE | FALSE | FALSE | 42231.32891 | P_W_WX_Y__CO_1_00 | 45 | 2015-12-15T19:03:48.263-05:00 | | |
| 1/1/1970 | 1/1/1970 | 8/19/2015 2:36:00 PM | 32 | 5 | FALSE | FALSE | FALSE | FALSE | FALSE | 42233.27871 | P_W_WX_Y__CO_1_00 | 45 | 2015-12-17T19:11:37.017-05:00 | No Channel available (ISDN Cause Code 34) | |
| 1/1/1970 | 1/1/1970 | 8/20/2015 2:02:53 PM | 30 | 5 | FALSE | FALSE | FALSE | FALSE | FALSE | 42234.27858 | P_W_WX_Y__CO_1_00 | 45 | 2015-12-18T19:05:55.91-05:00 | No Channel available (ISDN Cause Code 34) | |
| 1/1/1970 | 1/1/1970 | 8/21/2015 2:08:51 PM | 37 | 5 | FALSE | FALSE | FALSE | FALSE | FALSE | 42235.27914 | P_W_WX_Y__CO_1_00 | 54 | 2015-12-19T19:12:57.273-05:00 | Normal Call Clearing (ISDN Cause Code 16) | |
| 1/1/1970 | 8/21/2015 6:37:39 PM | 8/21/2015 6:37:43 PM | 43 | 1 | FALSE | FALSE | TRUE | FALSE | FALSE | 42235.27914 | P_W_WX_Y__CO_1_00 | 54 | 2015-12-19T19:13:49.353-05:00 | | |
| 1/1/1970 | 1/1/1970 | 8/21/2015 9:00:30 PM | 38 | 5 | FALSE | FALSE | FALSE | FALSE | FALSE | 42235.27914 | P_W_WX_Y__CO_1_00 | 54 | 2015-12-20T19:05:23.73-05:00 | No Channel available (ISDN Cause Code 34) | |
| 1/1/1970 | 1/1/1970 | 8/22/2015 2:08:24 PM | 43 | 5 | FALSE | FALSE | FALSE | FALSE | FALSE | 42236.27927 | P_W_WX_Y__CO_1_00 | 45 | 2015-12-20T19:06:37.823-05:00 | No Channel available (ISDN Cause Code 34) | |
| 1/1/1970 | 8/24/2015 2:13:03 PM | 8/24/2015 2:13:07 PM | 56 | 1 | FALSE | FALSE | TRUE | FALSE | FALSE | 42238.27917 | P_W_WX_Y__CO_1_00 | 45 | 2015-12-22T19:06:41.44-05:00 | | |
| 1/1/1970 | 8/25/2015 9:06:13 PM | 8/25/2015 9:07:30 PM | 113 | 1 | FALSE | FALSE | TRUE | FALSE | FALSE | 42238.27917 | P_W_WX_Y__CO_1_00 | 45 | 2015-12-23T19:05:09.773-05:00 | | |
| 1/1/1970 | 8/25/2015 2:52:31 PM | 8/25/2015 2:52:57 PM | 61 | 1 | FALSE | FALSE | TRUE | FALSE | FALSE | 42239.27946 | P_W_WX_Y__CO_1_00 | 54 | 2015-12-23T19:03:44.77-05:00 | | |
| 1/1/1970 | 8/26/2015 2:17:03 PM | 8/26/2015 2:17:03 PM | 53 | 5 | FALSE | FALSE | FALSE | FALSE | FALSE | 42240.27903 | P_W_WX_Y__CO_1_00 | 54 | 2015-12-24T19:10:37.047-05:00 | Normal Call Clearing (ISDN Cause Code 16) | |
| 1/1/1970 | 1/1/1970 | 8/26/2015 8:17:05 PM | 54 | 5 | FALSE | FALSE | FALSE | FALSE | FALSE | 42240.27903 | P_W_WX_Y__CO_1_00 | 54 | 2015-12-25T19:07:00.56-05:00 | Normal Call Clearing (ISDN Cause Code 16) | |
| 1/1/1970 | 1/1/1970 | 8/26/2015 9:32:24 PM | 51 | 5 | FALSE | FALSE | FALSE | FALSE | FALSE | 42240.27903 | P_W_WX_Y__CO_1_00 | 54 | 2015-12-25T19:07:27.73-05:00 | No Channel available (ISDN Cause Code 34) | |
| 1/1/1970 | 8/26/2015 10:55:58 PM | 8/26/2015 10:56:39 PM | 59 | 1 | FALSE | FALSE | TRUE | FALSE | FALSE | 42240.27903 | P_W_WX_Y__CO_1_00 | 54 | 2015-12-25T19:02:58.82-05:00 | | |
| 1/1/1970 | 8/27/2015 2:21:43 PM | 8/27/2015 2:22:33 PM | 103 | 1 | FALSE | FALSE | TRUE | FALSE | FALSE | 42241.27943 | P_W_WX_Y__CO_1_00 | 54 | 2015-12-25T19:05:23.793-05:00 | | |

Movant's Appendix 10

NSL000048

JOSEPH A. KOVACH
KOVACH vs NAVIENT SOLUTIONS

April 28, 2017
1—4

**Page 1**

1  J05550048ACR
2      IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF COLORADO
3
   Case No. 1:16-cv-02755-CMA-NYW
4
   _____
5
   JOSEPH A. KOVACH,
6
   Plaintiff,
7
   v.
8
   NAVIENT SOLUTIONS, LLC,
9
   Defendant.
10
   _____
11
          DEPOSITION OF JOSEPH A. KOVACH
12
             April 28, 2017
13
   Pursuant to Notice taken on behalf of the
14 Defendant, at 1900 Sixteenth Street, Suite 1700,
   Denver, Colorado 80202, at 10:16 a.m., before
15 Chandra L. Monis, Professional Reporter and
   Notary Public within Colorado.
16
17
18
19
20
21
22
23
24
25

**Page 2**

1  APPEARANCES:
2          JOSEPH C. HOEFFEL, Attorney at Law,
   from the Law Firm of Kimmel & Silverman, P.C.,
3  30 E. Butler Pike, Ambler, Pennsylvania 19002,
   appearing on behalf of the Plaintiff via
4  telephone.
5          TAYLOR T. HAYWOOD, Attorney at Law,
   from the Law Firm of Akerman LLP, 1900 Sixteenth
6  Street, Suite 1700, Denver, Colorado 80202,
   appearing on behalf of Defendant Carrington
7  Mortgage Services, LLC.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 3**

1              I N D E X
2  EXAMINATION:                           PAGE
3  By Ms. Haywood                            4
4                                        INITIAL
                                        REFERENCE
5  DEPOSITION EXHIBITS:
6  (No exhibits were marked.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 4**

1        WHEREUPON, the following proceedings
2  were taken pursuant to the Federal Rules of
3  Civil Procedure:
4        JOSEPH A. KOVACH,
5  having been duly sworn to state the whole truth,
6  testified as follows:
7        EXAMINATION
8  BY MS. HAYWOOD:
9      Q.  Good morning, Mr. Kovach.  Can you
10 please state your full name and spell it for the
11 record.
12     A.  Yeah.  It's -- my full name is
13 Joseph Alexander Kovach.  The last name is
14 K-o-v-a-c-h.
15     Q.  Okay.  I'm Taylor Haywood.  I'm here
16 to take your deposition today on behalf of
17 Navient Solutions, LLC, in the lawsuit you filed
18 against --
19     A.  Can you speak up, please?
20     Q.  Sure.  I'm Taylor Haywood.  I
21 represent Navient Solutions, LLC.  I'm here to
22 take your deposition today in the lawsuit you
23 filed against my client in U.S. District Court,
24 for the District of Colorado.
25        We also have your counsel on the

JOSEPH A. KOVACH                                                    April 28, 2017
KOVACH vs NAVIENT SOLUTIONS                                                5–8

Page 5

1 phone today. And I'll let him have the
2 opportunity to state his appearance.
3       MR. HOEFFEL: This is Joseph
4 Hoeffel, H-o-e-f-f-e-l, representing Mr. Kovach.
5       Q. (BY MS. HAYWOOD) Is it Kovach?
6       A. Kovach.
7       Q. Kovach. Can I call you Joe, or
8 would you prefer --
9       A. Joe is fine.
10      Q. Joe, have you ever given any other
11 depositions before?
12      A. No.
13      Q. Are you familiar with the deposition
14 procedure?
15      A. Yes.
16      Q. Okay. I'm still going to lay a few
17 ground rules before we go forward, just so we're
18 clear on what we're doing here today.
19 Everything that you say is under oath. So even
20 though today's deposition is being taken here in
21 our office, it's the same effect as if you were
22 standing in a courtroom.
23       You're under an obligation to tell
24 the truth. And do you understand the oath that
25 you just took requires you to testify under

Page 6

1 penalty of perjury?
2       A. Yes.
3       Q. Okay. The court reporter here is
4 transcribing everything that both you and I say.
5 So we need to do the best we can not to speak
6 over each other, that way we can make sure the
7 court reporter can take down what you say and
8 what I say.
9       We also need to speak loudly and
10 clearly, no uh-huh or huh-uhs. And if a
11 question calls for a yes-or-no answer, please
12 answer with a yes or no, rather than a nod or
13 shake of your head. We don't have a
14 videographer here today. The court reporter
15 can't take anything down that is not an audible
16 answer.
17      A. Okay.
18      Q. I'm going to attempt to make my
19 questions as clear as possible. If you don't
20 understand a question, please let me know. I
21 will repeat it or rephrase it for you. But if
22 you go ahead and answer it, we are going to
23 assume on -- and the record will reflect that
24 you understood the question.
25      A. Okay.

Page 7

1       Q. So please don't hesitate to ask for
2 clarification if you need it. Also, today we're
3 going to ask for your best estimate and
4 recollection to my questions.
5       So for example, if you don't
6 remember the exact words of a particular
7 conversation, we're still entitled to your best
8 memory of the general substance of that
9 conversation, the gist of it and what was
10 discussed, but I don't want you to guess or
11 speculate of things that might have happened.
12 But we're entitled to your best estimate and
13 recollection. Does that make sense?
14      A. Yes.
15      Q. Okay. If you need a break at any
16 time, just let me know. That applies to the
17 court reporter and counsel on the phone as well.
18 We're happy to take a break at any time. We
19 just ask that if you would like a break, and
20 there's a question pending you answer the
21 question, and then tell us you need a break and
22 we'll go from there.
23       Also, your attorney on the phone may
24 make objections to some of my questions today.
25 Those objections will be considered later by the

Page 8

1 judge. Unless your counsel instructs you not to
2 answer, we're entitled to have you respond to
3 the questions we ask today.
4       A. Okay.
5       Q. Okay?
6       A. Yes.
7       Q. And then after the deposition has
8 concluded, the court reporter is going to
9 prepare a transcript of all the questions and
10 answers today, and that transcript will be
11 provided to you. You'll have an opportunity to
12 review it for inaccuracies, but if you make any
13 changes, we're going to be able to comment on
14 that at time of trial. Do you understand that?
15      A. Yes.
16      Q. Okay. Are you presently taking any
17 medications that would affect your ability to
18 testify today?
19      A. I don't believe so.
20      Q. Okay. And are there any other
21 substances that you've taken recently that would
22 affect your ability to testify today?
23      A. Not that I know of.
24      Q. Okay. Do you have any questions
25 about the general ground rules we just



JOSEPH A. KOVACH
KOVACH vs NAVIENT SOLUTIONS

April 28, 2017

9–12

Page 9

1   discussed?
2       A.   No.
3       Q.   Okay.  If I refer to Navient -- my
4   client Navient Solutions, LLC, as just Navient
5   or NSL, can we both agree we're talking about
6   Navient Solutions, LLC --
7       A.   That's fine.
8       Q.   -- the defendant in this case?
9           Okay.  Is English your first
10  language?
11      A.   Yes.
12      Q.   Have you ever gone by any other name
13  besides Joseph Kovach?
14      A.   No.
15      Q.   Okay.  And I believe you said your
16  middle name was Alexander, correct?
17      A.   Yes.
18      Q.   What's your current address?
19      A.   309 East Highland Circle, Unit 108,
20  Centennial, Colorado 80122.
21      Q.   Is that a condominium?
22      A.   Yes.
23      Q.   How long have you lived there for?
24      A.   I've lived there since -- I'm
25  sorry -- December of 2009.

Page 10

1       Q.   Okay.  Do you own or rent?
2       A.   I own.
3       Q.   Do you have a mortgage on the
4   property?
5       A.   I'm sorry, say that again.
6       Q.   Do you have a mortgage on the condo?
7       A.   No, I do not.
8       Q.   Okay.  Is that also your mailing
9   address?
10      A.   Yes.
11      Q.   Do you own any other properties?
12      A.   No.
13      Q.   Have you used any other mailing
14  address besides the Highline --
15      A.   No.
16      Q.   Highline?
17      A.   Highland.
18      Q.   Highland.  In the last four years?
19      A.   No.
20      Q.   Where did you live before Highland
21  Circle?
22      A.   I lived in Englewood.
23      Q.   What was the address there?
24      A.   I don't remember.
25      Q.   Where in Englewood was it?

Page 11

1       A.   It was at the Marks Apartments, but
2   I don't remember which address we were at.
3       Q.   Okay.  Do you live there by yourself
4   on Highland Circle?
5       A.   No.  I have a roommate.
6       Q.   Who is your roommate?
7       A.   His name is Charlie.
8       Q.   What is Charlie -- is Charlie's last
9   name?
10      A.   Colletti.
11      Q.   Can you spell that, please?
12      A.   C-o-l-l-e-t-t-i.
13      Q.   Is that a friend?
14      A.   What's that?
15      Q.   What's your relationship with
16  Charlie?
17      A.   Oh, he's a friend.
18      Q.   How long has he lived at --
19      A.   Five years.
20      Q.   Does he pay you rent?
21      A.   What's that?
22      Q.   Does he pay you rent?
23      A.   Yes.
24      Q.   Approximately how much?
25      A.   260.

Page 12

1       Q.   Is that a month?
2       A.   Yes.
3       Q.   Did you ever have a mortgage on this
4   property?
5       A.   No.
6       Q.   Okay.  Are you married?
7       A.   No.
8       Q.   Do you have any children?
9       A.   No.
10      Q.   Have you been convicted of a
11  criminal offense?
12      A.   No.
13      Q.   Okay.  Did you review any documents
14  in preparing for today's deposition?
15      A.   Did I review any documents?
16      Q.   Yes.
17      A.   Just the interrogatories.  That's
18  all.
19      Q.   And those are the interrogatory
20  responses you gave to Navient in connection with
21  this case?
22      A.   Yeah.
23      Q.   Okay.  Do you recall you also gave
24  responses to requests for admission and request
25  for production to Navient?

JOSEPH A. KOVACH                                  April 28, 2017
KOVACH vs NAVIENT SOLUTIONS                              13–16

Page 13

1    A.  Yes.
2    Q.  Did you review those?
3    A.  I'm sorry, say that again.
4    Q.  Did you review those responses as
5  well?
6    A.  No.
7    Q.  Is there a reason why not?
8    A.  I don't know.
9    Q.  You don't know -- okay.
10       Did you -- what else did you do to
11  prepare for this deposition, besides reviewing
12  your interrogatory responses?
13    A.  Just talked to my attorney.
14    Q.  And who is your attorney?
15    A.  Hoeffel, Jake Hoeffel.
16    Q.  Is he your only attorney in this
17  case?
18    A.  Yeah.
19    Q.  And when did you talk to him?
20    A.  It'd be the 26th -- or the 25th,
21  excuse me.  Tuesday.
22    Q.  Tuesday the 25th?
23    A.  Yeah.
24    Q.  Okay.  About how long did you meet
25  with him?

Page 14

1    A.  About half an hour.
2    Q.  And was this a telephone
3  conversation?
4    A.  Yes.
5    Q.  Have you ever met Mr. Hoeffel in
6  person?
7    A.  No.
8    Q.  Is he your only attorney in this
9  case?
10    A.  Yes.
11    Q.  Okay.
12    A.  That I'm aware of.  I mean, there
13  might be other people working on the case.  He's
14  the only I've been talking to.
15    Q.  Okay.  Other than Mr. Hoeffel, have
16  you discussed this case with anyone else before
17  today's deposition?
18    A.  Before the deposition?
19    Q.  Uh-huh.
20    A.  The only other person I talked to
21  about the case was the attorney that did the
22  intake when I called, and that was Ryan
23  Fitzgerald.
24    Q.  R-y-a-n?
25    A.  I think so.

Page 15

1    Q.  Is that a male or female?
2    A.  A male.
3    Q.  So you retained Mr. Hoeffel's firm
4  telephonically?
5    A.  Yeah.
6    Q.  How did you find them?
7    A.  Off the internet.
8    Q.  And did you -- can you tell me a
9  little bit about your search parameters?
10    A.  My search?
11    Q.  Yes.
12    A.  Well, I saw them -- a commercial
13  for -- for creditlaw.com.  And I looked them up
14  on the internet, and that's how I got ahold of
15  Mr. Hoeffel.
16    Q.  Okay.  When you say "commercial," is
17  that a radio ad?
18    A.  It was a TV ad.
19    Q.  A TV ad?
20    A.  Yeah.
21    Q.  And that was a broadcast here in
22  Colorado?
23    A.  Yeah.
24    Q.  Do you recall the contents to the
25  ad?

Page 16

1    A.  No.
2    Q.  Have you seen other similar ads?
3    A.  No.
4    Q.  Okay.  If I understand correctly,
5  you learned about their firm on television, and
6  then you went on the internet and looked up
7  their phone number?
8    A.  Yeah.  I went on their website.
9    Q.  Do you recall when this was?
10    A.  It would have been back in August of
11  2015, I guess.
12    Q.  Okay.  And do they represent you in
13  any capacity besides this particular case?
14    A.  Beside this case, no.
15    Q.  Okay.  Have you ever been a party to
16  any other lawsuit?
17    A.  Not lawsuit, no.
18    Q.  You sounded like you stumbled a
19  little bit.  Is there something else you --
20    A.  I had to think about it.
21    Q.  Have you sued anyone before?
22    A.  No.
23    Q.  Has any sued you before?
24    A.  No.
25    Q.  Have you been involved in any



Page 17

1   lawsuit in any capacity other than as a
2   plaintiff or defendant?
3       A.   Other than what?
4       Q.   As a plaintiff or defendant.
5       A.   No.
6       Q.   Okay.  What is your experience with
7   the legal system then?  Have you, for example,
8   been on a jury?
9       A.   No.  I'm not an attorney.  I've been
10  on a jury.
11      Q.   Okay.  Do you recall when that was?
12      A.   Yeah.  That was back in, what, 2006.
13  It was a murder trial.
14      Q.   Okay.  And was that here in
15  Colorado?
16      A.   Yeah.
17      Q.   In the federal court?
18      A.   No.  In district.
19      Q.   The district can be state or federal
20  court.  Was it down here --
21      A.   It was in state court.
22      Q.   Do you recall the county?
23      A.   Denver.
24      Q.   Okay.  Other than --
25      A.   I was written up in the paper for

Page 18

1   it.
2       Q.   You were written up in the paper for
3   it?
4       A.   Yeah.  I was the first blind juror
5   in Denver.
6       Q.   Interesting.  Okay.  So you said
7   that was in 2006?
8       A.   Yeah.
9       Q.   So other than sitting as a juror in
10  this case, you have no real experience with the
11  legal system?
12      A.   I've been a defendant in a couple of
13  other legal matters.
14      Q.   Okay.  Can you describe those for
15  me?
16      A.   I had a domestic violence arrest,
17  and then I also had a damage of private
18  property.
19      Q.   Okay.  Do you recall any specifics,
20  what years these were?
21      A.   No.  It would have been in the last
22  ten years though -- or actually, maybe about 12
23  years ago.
24      Q.   Here in Colorado?
25      A.   Yeah.

Page 19

1       Q.   Have you lived in Colorado your
2   whole life?
3       A.   Yeah.
4       Q.   In the Denver area your whole life?
5       A.   Yes.  Well, not my whole life,
6   but...
7       Q.   Where did you live outside --
8   outside of Denver?
9       A.   I lived in Douglas County for a
10  number of years.
11      Q.   Does your family live here as well,
12  your parents?
13      A.   My mother and father are both
14  deceased.
15      Q.   Okay.  Do you have siblings?
16      A.   Yeah.  I have one sister, two
17  half-sisters.
18      Q.   One sister and two half-sisters?
19      A.   Yeah.
20      Q.   Do they live in Denver as well?
21      A.   My sister does.  My half-sisters
22  live in Florida.
23      Q.   What is your sister's name?
24      A.   Jessica Kovach, same spelling,
25  K-o-v-a-c-h.

Page 20

1       Q.   What are your half-sisters' names?
2       A.   Carley and Carrie Anne.
3       Q.   And they live in Florida?
4       A.   They live in Florida, yeah.
5       Q.   Okay.  Are you currently employed?
6       A.   No.
7       Q.   Have you ever been employed?
8       A.   It's been a long time.
9       Q.   When specifically was the last time
10  you were employed?
11      A.   It would have been about 12 years
12  ago.  I was volunteering, answer telephones at a
13  dance studio.
14      Q.   I'm sorry, I didn't hear your
15  response.
16      A.   I was volunteering, answering
17  telephones in a dance studio.
18      Q.   You said that was about 12 years
19  ago, so that would have been about 2002; is that
20  right?
21      A.   Yes.  2003.
22      Q.   What sources of income have you had
23  since 2003?
24      A.   What's that?
25      Q.   What sources of income have you had

Page 21

1  since 2003?
2      A.  Oh, I'm on social security.
3      Q.  Is that your only source of income?
4      A.  Yes.
5      Q.  What about the condo you purchased,
6  where did the funds for that come from?
7      A.  I got money from my mother when she
8  passed away.
9      Q.  Okay.
10     A.  She passed away about seven years
11 ago.
12     Q.  Okay.  And the money you used, I
13 would assume, just to buy the home without
14 taking out a loan; is that correct?
15     A.  Yes.
16     Q.  Okay.  Can you tell me what your
17 highest level of education is?
18     A.  Some college.
19     Q.  Okay.  And when did you obtain a
20 high school degree?
21     A.  1995 I graduated from high school.
22     Q.  Where was that?
23     A.  Englewood.
24     Q.  Englewood High School?
25     A.  Yeah.

Page 22

1      Q.  Okay.  And in 1995, did you go
2  straight to -- you said you had some college
3  education, right?
4      A.  Yes.
5      Q.  Did you go straight to college right
6  after high school?
7      A.  Yes, I did.
8      Q.  And what college was that?
9      A.  I went to UNC, and then I came to --
10 and I left there for reasons that aren't
11 relevant to the case.  And I -- I then went to
12 Metro State Community College for a while.
13     Q.  About how many years did you attend
14 UNC?  Is that the University of Northern
15 Colorado?
16     A.  Oh, I didn't attend it for more than
17 a week.
18     Q.  Oh, just one week?
19     A.  Yeah.  I got thrown out.
20     Q.  For what?
21     A.  For selling pot.  That's why I said
22 it wasn't relevant to the case.
23     Q.  Okay.  Once you got thrown out for
24 selling pot in 1997, you went to Metro State
25 University immediately thereafter?

Page 23

1      A.  No.  Probably about a year or year
2  and a half afterwards.
3      Q.  Okay.
4      A.  Something like that.  Maybe not
5  quite that long.  I can't remember.  It was a
6  long time ago.
7      Q.  This would have been 1999 or so --
8      A.  Yeah.
9      Q.  -- based on your high school
10 graduation date?
11         Did you get a degree from Metro
12 State University?
13     A.  No.
14     Q.  Why did you drop -- were you a
15 full-time student there?
16     A.  I was attending the computer program
17 for people with disabilities, and I didn't --
18 didn't do the work, so I didn't finish the
19 program.
20     Q.  Okay.  And did you obtain any loans
21 for your education either at UNC or Metro State
22 University?
23     A.  No.  Rehab was paying for it.
24     Q.  Okay.  Besides your enrollment at
25 UNC for a week and Metro State University, did

Page 24

1  you attend any other higher education
2  institutions?
3      A.  Yeah.  I tried Kaplan University,
4  their paralegal program, but I was having back
5  problems, and I couldn't do the work,
6  couldn't -- couldn't focus on what I needed to
7  do for them, so that's why I'm in this situation
8  with the student loan.
9      Q.  Did you say "back problems"?
10     A.  Yeah.
11     Q.  Okay.  And what courses did you --
12 well, first of all:  When did you enroll at
13 Kaplan University?
14     A.  I don't exactly remember.  I guess
15 it would have been 2003, something like that.  I
16 don't remember exactly.
17     Q.  Okay.  And did you obtain loans to
18 go to Kaplan?
19     A.  Yeah.  Yeah.
20     Q.  And do you recall what type of loans
21 those were?
22     A.  They were federal student loans.  I
23 don't remember who, what they were, whatever the
24 four...
25     Q.  Okay.  And are these loans through



JOSEPH A. KOVACH
KOVACH vs NAVIENT SOLUTIONS

April 28, 2017
25–28

Page 25

1 Navient?
2      A.   They were through -- boy, I'm trying
3 to remember who the original lender was.  I
4 don't remember who the original lender was.
5      Q.   Was it Citi?
6      A.   What's that?
7      Q.   Was it Citi, CitiBank?
8      A.   I'm not sure.  I don't remember.  I
9 don't want to give a false answer, so...
10      Q.   That's fine if you don't remember.
11      Okay.  Kaplan University, was that
12 online classes?
13      A.   Yeah.
14      Q.   You said paralegal studies.  Do you
15 recall how many classes you took?
16      A.   I think I was taking three.
17      Q.   So it was --
18      A.   But I don't remember.
19      Q.   -- part time?
20      A.   I don't remember.
21      Q.   Okay.  But you obtained a degree,
22 correct?
23      A.   No.  And they were to send the money
24 back, and they never did, so that's why I ended
25 up owing the money now.

Page 26

1      Q.   Okay.  Who was supposed to send the
2 money back?
3      A.   Kaplan was supposed to send it back
4 to the lender, but they never did.  They kept
5 the money.
6      Q.   Are you talking about the student
7 loan money?
8      A.   The student loan money, yeah.
9      Q.   Why were they supposed to send the
10 money back to the original lender?
11      A.   Because I canceled my classes in
12 time.  And they said because it was a medical
13 thing, they would just send the money back to
14 the lender, and they never did.  They ended up
15 keeping the money and never told me that.  I
16 actually had to let the lender know.
17      And by the time I realized that, it
18 was too late, and they ended up keeping the
19 money.  Nobody told me I was supposed to let the
20 lender know.  They said they were going to do
21 that for me.
22      Q.   And when you say "the lender," we're
23 not talking about Navient, right?
24      A.   No.
25      Q.   We're talking about --

Page 27

1      A.   The original.
2      Q.   -- the original lender, and we're
3 not sure who that is.
4      Do you recall how many loans we're
5 talking about?
6      A.   Two.
7      Q.   Two.  And are these the same two
8 loans that Navient services?
9      A.   Yes.
10      Q.   Do you have an estimate or balance
11 on those two loans?
12      A.   No.  I think it was around 3,600 or
13 something like that.  I'm not sure.  I'm
14 probably really wrong.
15      Q.   Our claims records show around
16 3,600, 3,606.68.  Does that sound right to you?
17      A.   That sounds about right, yeah.
18      Q.   Do you recall when Navient started
19 servicing these two loans?
20      A.   What's that?
21      Q.   Do you recall when Navient started
22 servicing the two loans?
23      A.   It would have been about three years
24 ago, when they got taken over from Sally Mae.
25      Q.   Okay.  And do you recall when Sally

Page 28

1 Mae started servicing the loans?
2      A.   Probably about five years ago.
3      Q.   So around 2011, '12?
4      A.   Yeah.
5      Q.   Okay.  And you said that you didn't
6 complete your courses at Kaplan because of back
7 problems?
8      A.   Yeah.
9      Q.   Can you be more specific on the back
10 issues you were suffering?
11      A.   No.  I've always had back problems.
12 I was in a car accident a good number of years
13 ago, and I've had back problems ever since.
14      Q.   And how did the back problems
15 prevent you from taking your online classes?
16      A.   What's that?
17      Q.   I'm curious on the relationship
18 between the back problems and withdrawing from
19 school.  Can you tell me why the back
20 problems --
21      A.   I couldn't focus and do work.  I
22 couldn't focus and do my work.
23      Q.   And you told that to Kaplan
24 University?
25      A.   Yeah.



JOSEPH A. KOVACH
KOVACH vs NAVIENT SOLUTIONS

April 28, 2017

29–32

Page 29

1    Q.   And then withdrew from your three
2  classes?
3    A.   And I was also having some technical
4  problems working the -- working the classroom
5  stuff for Kaplan, because it was online.
6    Q.   Okay.  And what -- what do you mean
7  by technical problems?
8    A.   I use a voice synthesis with the
9  computer, and sometimes it doesn't read things
10  properly.
11    Q.   I see.  So is your computer at home
12  set up if you go to a particular web page, it'll
13  read you the content of that web page?
14    A.   Yeah.  As long as the web page is
15  accessible.  Which some of them are -- most of
16  them are, but some of them aren't.
17    Q.   Right.  And Kaplan, I guess, had
18  some issues with being able to --
19    A.   Yeah.
20    Q.   -- distribute content to you?
21       Okay.  Do you receive monthly
22  statements from Navient regarding these two
23  loans?
24    A.   Do I receive what?
25    Q.   Monthly statements.

Page 30

1    A.   Yeah.
2    Q.   When you receive them, is someone --
3  does Charlie or someone read them to you, or how
4  is it that you --
5    A.   Through email.
6    Q.   Through email you get them.  I see.
7  So they come through your email, and then your
8  computer system reads them to you?
9    A.   Yes.
10    Q.   And about how long has that been
11  going on for?
12    A.   I believe since they serviced the
13  loan.
14    Q.   And before then did you receive
15  statements from Sally Mae?
16    A.   No.
17    Q.   Did you receive any communications
18  from Sally Mae?
19    A.   No.
20    Q.   Okay.
21    A.   Not that I know of.
22    Q.   Okay.
23    A.   They would just call me on the
24  phone.
25    Q.   Sally Mae would?

Page 31

1    A.   Yeah.
2    Q.   Okay.  Do you have access to
3  Navient's website?
4    A.   Yeah.  I just don't remember my user
5  name and password.
6    Q.   When's the last time you logged into
7  Navient's website?
8    A.   Oh, probably when I set up the
9  account two years ago.
10    Q.   Okay.  And you're not making
11  payments on these two --
12    A.   No.
13    Q.   Do you recall when the last time you
14  made payment on those two loans was?
15    A.   Not since -- not since August of
16  2015.
17    Q.   That was your last payment, August
18  2015?
19    A.   Yeah.
20    Q.   Okay.  So Navient's records show
21  that you submitted a Federal Stafford Loan,
22  Master of Promissory Note in November 2007.
23  Does that sound accurate to you in terms of the
24  time frame?
25    A.   2007?

Page 32

1    Q.   November 3, 2007.
2    A.   They said that's when the loan was
3  initiated?
4    Q.   Our records show when the promissory
5  note was signed.
6    A.   Yeah, that sounds about right.
7    Q.   Okay.  And it looks like --
8    A.   I didn't realize it's quite that
9  long ago.
10    Q.   It's not a memory test.  I'm happy
11  to tell you what our records show.  I'm not
12  going to mark this as an exhibit, but it lists
13  your address as 300 West Yale Avenue,
14  Apartment 1002.
15    A.   Yeah, that's where I lived at the
16  time.
17    Q.   And that's where you lived before
18  purchasing your condominium, right?
19    A.   No.
20    Q.   Where did you --
21    A.   I lived there for about ten years,
22  and then I ended up moving in with my parents
23  for a short while.  Then my mom passed away, and
24  I got the condo.
25    Q.   I see.  So 2007 sounds correct to

JOSEPH A. KOVACH
KOVACH vs NAVIENT SOLUTIONS

April 28, 2017
33–36

Page 33

1  you.
2        And is it your understanding that
3  you obtained Federal Stafford loans?
4        A.  Yeah.
5        Q.  Okay.  Do you recall signing a
6  master promissory note electronically?
7        A.  Yes.
8        Q.  Okay.  And you agree you filed your
9  complaint against Navient in federal court here
10  in Colorado, right?
11       A.  Yes.
12       Q.  Is it your understanding you filed
13  it in November 2016?
14       A.  Yes.
15       Q.  I'm not going to mark your complaint
16  as an exhibit either, but I'm wondering if you
17  did read it or had someone read it to you before
18  it was filed.
19       A.  Yes.
20       Q.  Which -- did someone read it to you?
21       A.  Yes.
22       Q.  And who was that?
23       A.  Charlie, I believe.
24       Q.  So your attorney didn't read it to
25  you?

Page 34

1        A.  No.
2        Q.  Did your attorney know that you are
3  totally blind?
4        A.  Yes.
5        Q.  Okay.  But they mailed you the
6  complaint and asked Charlie to read it to you?
7        A.  Yes.
8        Q.  Okay.  Do you know what allegations
9  have been made on your behalf against Navient?
10       A.  Yes.
11       Q.  Okay.  So in your own words, what is
12  it you're claiming Navient did wrong?
13       A.  I'm claiming they called me multiple
14  times a day after I stopped -- telling them not
15  to call me anymore.  And they just kept doing
16  it, doing it, and doing it for a good month.
17       Q.  And do you have a time frame of when
18  they called you multiple times a day?  Was it in
19  August of 2015?
20       A.  Yes.
21       Q.  Okay.
22       A.  Pretty much that entire month.
23       Q.  The entire month of August 2015.  Is
24  there a reason that you didn't file suit in
25  August 2015?

Page 35

1        A.  What's that?
2        Q.  I'm curious about why if this case
3  is about calls in August 2015, your complaint
4  was not filed until a year and three months --
5  four months later.  Do you have any
6  understanding --
7        A.  Oh, because I was trying to maybe
8  get the loan discharged, and I don't qualify for
9  discharge, so I think that put a hold on the --
10  the case, because I -- I -- that's the only
11  thing I can think.
12       Q.  Okay.  And with whom were you trying
13  to get the loan discharged?
14       A.  What's that?
15       Q.  Who did you contact about trying to
16  get the loan discharged?
17       A.  Just the -- I went to
18  disabilitydischarge.com and downloaded the
19  paperwork, but I don't -- I don't qualify.  I
20  read into it, and I don't qualify.
21       Q.  Okay.  What was the basis of your
22  discharge request?
23       A.  Because I'm permanently disabled.
24       Q.  And were you permanently disabled
25  when you obtained these two student loans?

Page 36

1        A.  Yes, I was.
2        Q.  And is that the reason they won't
3  discharge the loans?
4        A.  I believe so, yes.  And income.
5        Q.  What do you mean income?
6        A.  I make too much money.
7        Q.  Where are you making money from?
8        A.  From my -- from the rent I get from
9  my roommate and my social security.  It's too
10  much to qualify for discharge.
11       Q.  I think you said you're getting 260
12  a month for rent?
13       A.  That's correct.
14       Q.  And how much are you getting for
15  social security?
16       A.  After Medicare is deducted, I get
17  $725 a month.  I make 893, and it's just a
18  little bit too much for a discharge.
19       Q.  You make 893 a month?
20       A.  Yes.
21       Q.  The numbers you gave me are higher
22  than that.  Is it possible you're making less
23  than 735 in social security?
24       A.  No.
25       Q.  But 735 for social security plus 260



Page 37

1  a month for rent is over -- it's about $1,000?
2      A.  Yeah.  I make 893 on top -- I make
3  893 in social security, and I get $260 for my
4  rent.  That's all I get.
5      Q.  You make 893 in social security?
6      A.  Right.
7      Q.  260 from your roommate?
8      A.  Right.
9      Q.  And you said Charlie has lived there
10  for five years?
11      A.  What?
12      Q.  Does he have a lease with you?
13      A.  No.
14      Q.  Does he have long-term plans to stay
15  in your condominium?
16      A.  Yes.  He's not planning on moving
17  any time soon.
18      Q.  Okay.  Does Charlie have a job?
19      A.  No.  He's on social security.
20      Q.  He is.  Okay.  How did you meet
21  Charlie?
22      A.  Through a friend of a friend.
23      Q.  Have you known him more than five or
24  six years?
25      A.  Yes.

Page 38

1      Q.  Okay.  Is Charles -- or Charlie
2  short for Charles?  Do you know?
3      A.  What's -- yes, it is short for
4  Charles.
5      Q.  Remind me what his last name was?
6      A.  Colletti.
7      Q.  Can you spell that?
8      A.  C-o-l-l-e-t-t-i.
9      Q.  Do you know his middle name?
10      A.  I know it's a J, but I can't
11  remember what it stands for.  John, I think.
12      Q.  John.  Approximately how old is
13  Charlie?
14      A.  61.
15      Q.  Do you know if he's lived in the
16  Denver area for the last ten years?
17      A.  Yes.
18      Q.  Do you know where he lived before he
19  moved into your condo?
20      A.  No.  In Glendale, I believe.
21      Q.  Okay.
22      A.  I'm not sure though.
23      Q.  Is Charlie married?
24      A.  No.
25      Q.  Does Charlie have kids?

Page 39

1      A.  No.
2      Q.  Okay.  So you -- going back to the
3  basis for your lawsuit here.  You said this case
4  is about Navient calling you multiple times in
5  August 2015.  Is it your understanding you filed
6  a claim under the Telephone Consumer Protection
7  Act?
8      A.  Yes.
9      Q.  If I refer to that act as TCPA, you
10  know what I'm talking about?
11      A.  Yes.
12      Q.  What's your understanding of the
13  damages you're seeking in this case?
14      A.  What's that?
15      Q.  What is your understanding of the
16  damages you are seeking in this case?
17      A.  That I can get 500 to $1,500 per
18  call, but that's all I'm aware of.
19      Q.  So you're asking for between 500 and
20  $1,500 per call at some point after you told
21  Navient to stop calling --
22      A.  Yes.
23      Q.  -- is that correct?
24      Okay.  I guess I'd like to go
25  through some of these specific allegations you

Page 40

1  made in your complaint.
2      A.  Okay.
3      Q.  When you received -- well, first, I
4  guess, when you received a copy of your
5  complaint from your attorney, and Charlie read
6  it to you, did you make any revisions?
7      A.  No.
8      Q.  And the information that appears in
9  the complaint was provided to your counsel on a
10  telephone call sometime in August 2015, right?
11      A.  Yes.
12      Q.  Give me a minute to just find the
13  complaint.  Okay.  I'm going to read you some of
14  the allegations in the complaint, and then just
15  ask a couple of follow-up questions.
16      In paragraph Number 10 you said,
17  Plaintiff has a cellular -- cellular telephone
18  number that he has had for more than one year.
19  What telephone number does this paragraph 10
20  refer to?
21      A.  Probably 720-236-5587.
22      Q.  And is that the only cellular number
23  at issue in this case?
24      A.  Yes.
25      Q.  Did you say 5587 is the last four

JOSEPH A. KOVACH                                    April 28, 2017
KOVACH vs NAVIENT SOLUTIONS                         41–44

Page 41

1   digits?
2       A.   Yes.
3       Q.   Okay.  And when did you begin using
4   the cellular telephone number ending in 5587?
5       A.   2014, I think.
6       Q.   Okay.
7       A.   I've had the number for about
8   four -- four years.
9       Q.   You've had the number ending in 5587
10  for about four years?
11      A.   Yeah.
12      Q.   Okay.  Did your attorney tell you
13  that he subpoenaed your telephone records from
14  T-Mobile?
15      A.   Yeah.  He said he hasn't gotten them
16  yet.
17      Q.   I think he just received them this
18  week, and I just received them Tuesday.
19      A.   You guys finally got them?
20      Q.   We finally got them.
21      A.   Good.
22      Q.   T-Mobile's records show the number
23  was activated November 26, 2013.
24      A.   2013.
25      Q.   November 26, 2013.

Page 42

1       A.   That could be, yeah.
2       Q.   They also show the subscriber name
3   as Jessica Kovach.
4       A.   Yeah, that's my sister.  We have a
5   family plan.
6       Q.   Does Jessica use this number ending
7   in 5587 as well?
8       A.   No.
9       Q.   She has a different number --
10      A.   Yes.
11      Q.   Sorry, we can't talk over each
12  other.  She can't take us down.
13           She has the same -- she has a
14  different number on the same plan, right?
15      A.   Yes.
16      Q.   Okay.  Is there anyone else on that
17  plan?
18      A.   Her son, Isaiah Kovach.
19      Q.   And he's got a third line?
20      A.   Yeah.
21      Q.   Anyone else?
22      A.   What's that?
23      Q.   Is there anyone else?
24      A.   No.
25      Q.   Who pays this telephone bill for

Page 43

1   this account?
2       A.   My sister does.
3       Q.   Have you ever paid it?
4       A.   I give her money for it
5   occasionally.
6       Q.   When you say "occasionally," is that
7   every month, every three months?
8       A.   I don't have to give her anything,
9   because I lent her a bunch of money.
10      Q.   You --
11      A.   So she's been taking care of the
12  phone bill.
13      Q.   How much money did you lend her?
14      A.   I don't remember.  It was a lot.
15      Q.   $50,000?
16      A.   No.
17      Q.   $10,000?
18      A.   No.  I think it was 1,200 or
19  something like that.  So she's been paying my
20  phone bill.
21      Q.   And when did you lend her $1,200?
22      A.   About three years ago.
23      Q.   So that would have been 2014 or so?
24      A.   Yeah.
25      Q.   Okay.  Do you know how much the

Page 44

1   monthly phone bill for your three lines is?
2       A.   For the three lines?
3       Q.   Yes.
4       A.   No.
5       Q.   Okay.
6       A.   I know how much mine is.
7       Q.   How much is that?
8       A.   It's about 75 a month.
9       Q.   Okay.  And when's the last time --
10  besides from lending your sister $1,200, when's
11  the last time you gave her money to pay your
12  phone bill?
13      A.   It would have been three years ago.
14      Q.   Okay.  Do you receive monthly
15  statements from T-Mobile?
16      A.   I don't receive them.  My sister
17  does.
18      Q.   Do you have access to your account
19  information at T-Mobile?
20      A.   I do now, yeah.
21      Q.   How recently was that?
22      A.   She just put me on the account this
23  last month.
24      Q.   I see.  So before then you didn't
25  really know --

JOSEPH A. KOVACH
KOVACH vs NAVIENT SOLUTIONS

April 28, 2017
45–48

Page 45

1     A.  I didn't have access to the account,
2  no.
3     Q.  Okay.  Has anyone else besides you
4  used the cell number ending in 5587?
5     A.  No.
6     Q.  Do you recall if you ever provided
7  it to Navient?
8     A.  Yes, I did.  I don't remember when
9  though.
10    Q.  Okay.  If you got -- if the cell
11  phone was activated November 26, 2013, would you
12  say you would have given it to Navient
13  immediately, if you remember?
14    A.  I probably -- I probably gave it to
15  Sally Mae, and they gave it to Navient when they
16  sold the loan to them.
17    Q.  Okay.
18    A.  Or split companies, whatever they
19  did.  I don't know.
20    Q.  Do you recall whether you gave them
21  your phone number on a telephone call or through
22  their website?
23    A.  I don't -- maybe it was through the
24  website.  I don't remember, to be honest with
25  you.  Somehow they got my number.

Page 46

1     Q.  But you gave it to them, right?
2     A.  Yeah.
3     Q.  Okay.  Do you recall giving it to
4  them more than once?
5     A.  What's that?
6     Q.  Do you recall giving them your cell
7  number ending in 5587 more than once?
8     A.  No.
9     Q.  Do you recall ever giving your
10  number to Navient as opposed to Sally Mae?
11    A.  I don't remember.
12    Q.  Okay.  Are you aware that Navient
13  served a request for admission on you in
14  connection with this case?
15    A.  What?
16    Q.  Are you aware Navient served a
17  request for admission on you in connection with
18  this case?
19    A.  I'm sorry, I'm not understanding the
20  question.
21    Q.  Okay.  Are you aware that Navient
22  served requests for admission on you in
23  connection with this case?
24    A.  Yes, I guess I am.
25    Q.  Okay.  And do you recall responding

Page 47

1  to those with the assistance of your counsel in
2  March of this year?
3     A.  Yes.
4     Q.  Okay.  In one of the requests for
5  admission it says, Request for admission
6  Number 4, Admit you provided your cellular
7  telephone number 720-236-5587 to NSL via NSL's
8  website on June 4, 2015.  And your response was,
9  Admitted.  Is that response accurate?
10    A.  Yes, I guess it is.
11    Q.  Okay.  So you -- I think we can
12  agree you provided Navient with your cellular
13  telephone number ending in 5587 at least on
14  June 4, 2015, right?
15    A.  Yes.
16    Q.  And if you recall, did you say you
17  gave your number to Sally Mae as well?
18    A.  Yes.
19    Q.  So there would have been at least
20  two instances in which you gave this cellular
21  telephone number ending in 5587 to your student
22  loan lender, Navient or Sally Mae, right?
23    A.  Yes.
24    Q.  Do you recall anything beyond giving
25  your number on the website on June 4, 2015 -- I

Page 48

1  guess let me rephrase the question.
2        Do you recall any other instances
3  where you provided Navient your cellular
4  telephone number?
5     A.  No.
6     Q.  Okay.  I guess going back to your
7  complaint.  In paragraph 12 you wrote, Beginning
8  in or around August 2015, defendant placed
9  repeated harassing telephone calls to plaintiff
10  on her cellular telephone.  The "her" I'm
11  guessing is a typo, correct?
12    A.  Yes.  Should be him.
13    Q.  Okay.  Right.  I just wanted to make
14  sure.  Okay.
15        Since it says here in paragraph 12,
16  Beginning in or around 2017, it wouldn't
17  surprise you if I told you I looked at Navient's
18  records and T-Mobile's records, and there was no
19  record of calls from Navient to you at your
20  cellular telephone number in July 2015, correct?
21    A.  I don't think so.
22        MR. HOEFFEL:  Taylor, I'm just going
23  to object to the question.  You said August
24  2017.  Just so we have a clear record, I think
25  you meant 2015.



Page 49

1    MS. HAYWOOD:  If I said 2017, I was
2  mistaken.  I'm reading right here beginning in
3  or around August 2015.
4    MR. HOEFFEL:  If you could just
5  restate the question, that's fine.
6    Q.  (BY MS. HAYWOOD)  Yeah.  Mr. Kovach,
7  in paragraph 12 of your complaint you say,
8  Beginning in or around August 2015, defendant
9  placed repeated harassing telephone calls to
10  plaintiff on her cellular telephone.  We
11  discussed "her" is a typo.  It should say his.
12    But my question is whether it would
13  surprise you that my client does not have any
14  record of calls prior to -- the month prior to
15  August 2015, which would have been July 2015; is
16  that right?
17    A.  Yes.
18    Q.  Okay.  And so you're seeking in this
19  case between 500 and $1,500 for each call in
20  August of 2015, correct?
21    A.  Correct.
22    Q.  Okay.  Am I correct that you claimed
23  you revoked your consent for Navient to call you
24  in mid-August 2015?
25    A.  Yes.

Page 50

1    Q.  Okay.  In paragraph 16 you say,
2  Annoyed by the repeated calls, plaintiff spoke
3  with defendant in mid-August and told them to
4  stop calling him, revoking consent for any
5  future communications to her cellular telephone.
6    A.  Once again, there's a typo.  It
7  should be him.
8    Q.  To his cellular telephone.  I agree
9  with that.
10    When you say "mid-August," that
11  refers to, in paragraph 16, mid-August of 2015,
12  right?
13    A.  Yes.
14    Q.  Is there any reason you could not
15  have been more specific than the term
16  "mid-August"?
17    A.  I just didn't remember the exact
18  date that I asked them to stop making calls.
19    Q.  Okay.
20    A.  That was the best of my recollection
21  at the time.
22    Q.  Do you have any notes you made about
23  your calls with Navient?
24    A.  No.
25    Q.  So how do you remember mid-August

Page 51

1  2015?
2    A.  I just -- I just remember it being
3  mid-August, around mid-August.
4    Q.  Okay.  Paragraph 16 uses the term
5  "spoke."  Am I correct, your position is that
6  you told my client, Navient, to stop calling on
7  the telephone?
8    A.  Yes.
9    Q.  Do you recall who you spoke with?
10    A.  No.
11    Q.  Do you recall whether it was an
12  incoming or outcoming call?
13    A.  It was incoming.
14    Q.  Meaning Navient called you?
15    A.  Yes.
16    Q.  Do you remember the substance of the
17  conversation?
18    A.  No.  I just told them to stop
19  calling.
20    Q.  Okay.  Do you recall what phone
21  number Navient called you?
22    A.  No, not at this time.
23    Q.  What cellular telephone number --
24    A.  I did back then, but not now.
25    Q.  What phone numbers do you use -- or

Page 52

1  did you use in August 2015, besides your cell
2  number ending in 5587?
3    A.  I have a house number.
4    Q.  And what number is that?
5    A.  720-389-7436.
6    Q.  Besides your house number ending in
7  7436 and your cellular telephone number ending
8  in 5587, did you use any other phone number --
9    A.  No.
10    Q.  -- in August 2015?  No?
11    A.  No.
12    Q.  Do you recall ever speaking with
13  Navient on any phone other than your cell ending
14  in 5587 and your home phone ending in 7436?
15    A.  No, but they did call me on the
16  house phone when I told them to stop at the
17  house.
18    Q.  And that would be the 7436?
19    A.  Yeah.  And they were harassing for
20  that too, but I can't claim for that.
21    Q.  Right.  You understand your claims
22  are just concerning the calls on -- sorry, the
23  calls Navient made to your cell ending in 5587,
24  right?
25    A.  Yeah.



JOSEPH A. KOVACH
KOVACH vs NAVIENT SOLUTIONS

April 28, 2017
53–56

Page 53

1     Q.   Okay.  Are you aware Navient served
2  interrogatories on you in connection with this
3  case?
4     A.   Yes.
5     Q.   And those are the ones you said you
6  reviewed before coming here today, right?
7     A.   Yeah.
8     Q.   When you said "reviewed," did you
9  just read over your answers once or twice?
10     A.   Yeah.
11     Q.   Okay.  In Interrogatory Number 6 we
12  wrote, Identify all communications between you
13  and NSL regarding the loan.  And our response
14  then asks you to be more specific and specify
15  the date of the communication, the substance of
16  the communication, any notes, memoranda,
17  documents, and the name of the individual with
18  whom you communicated.
19        You wrote in here, Plaintiff is
20  unable to recall the specific dates and times of
21  each and every telephone conversation he had
22  with defendant.  However, plaintiff does recall
23  receiving calls from defendant throughout August
24  2015.  Plaintiff received automated calls that
25  included a prerecorded voice that would

Page 54

1  announce, Hi, this is Heather from Navient, as
2  well as calls from real people.  Plaintiff
3  remembers first revoking consent to be called in
4  or around mid-August of 2015.
5        Based on your response to this
6  interrogatory, am I correct that you authorized
7  Navient to contact you on your cellular
8  telephone until sometime up or around mid-August
9  2015, when you spoke with Navient on the
10  telephone and told them to stop calling?
11        MR. HOEFFEL:  I'm just going to
12  object to the form of that question.  But,
13  Mr. Kovach, if you can answer, please go ahead.
14     A.   That would be, yeah, I did -- they
15  did have consent up until August.
16     Q.   (BY MS. HAYWOOD)  Okay.  So we
17  shouldn't be looking for a call outside the
18  August 2015 time frame, correct?
19     A.   Right.
20     Q.   Okay.  Based on our earlier
21  discussion, I'm guessing you have not reviewed
22  the T-Mobile records that we just received this
23  week; is that correct?
24     A.   Correct.
25     Q.   Is T-Mobile still your current

Page 55

1  cellular service provider?
2     A.   What's that?
3     Q.   Is T-Mobile still your cell service
4  provider?
5     A.   Yes.
6     Q.   Can you tell me a little bit about
7  your cell phone usage?  For instance -- well,
8  first off, what type of phone do you have?
9     A.   iPhone.
10     Q.   Have you had an iPhone in the last
11  four years?
12     A.   Yes.
13     Q.   Where do you usually keep your
14  phone?
15     A.   In my pocket.
16     Q.   Does it have a ringer?
17     A.   Yes.
18     Q.   And is the ringer usually on?
19     A.   Yes.
20     Q.   And when I say "on," I mean it plays
21  a sound as opposed to vibrate.
22     A.   Yes.
23     Q.   And what does the ringer sound like?
24     A.   It's -- it's the battleship alarm.
25     Q.   Okay.  I'm not sure I know what that

Page 56

1  is. But how do you know who is calling you when
2  the phone rings?
3     A.   It announces the number and the
4  name.
5     Q.   And it does before or after the
6  battleship?
7     A.   Before.  It's usually overridden by
8  the ringer, so I don't hear who it is until I
9  answer the phone.
10     Q.   I see.  How long have you had this
11  battleship ringer for?
12     A.   Oh, since I got my new phone.  About
13  a year ago.
14     Q.   What is the battleship ringer, just
15  out of curiosity?
16     A.   It just sounds like a battleship
17  alarm going out.
18     Q.   So it sounds like a siren?
19     A.   Yeah.  It's a loud siren going off.
20     Q.   Did you choose that yourself?
21     A.   Yes.
22     Q.   Okay.
23     A.   It's the only one I can hear, so...
24     Q.   I see.  So you keep your ringer on
25  24 hours a day?



JOSEPH A. KOVACH
KOVACH vs NAVIENT SOLUTIONS

April 28, 2017
57—60

Page 57

1    A.  Yes.
2    Q.  And if the phone rings in the middle
3  of the night, I assume it would wake you up?
4    A.  Yes.
5    Q.  From the T-Mobile records that -- or
6  from the records T-Mobile produced, I believe
7  your counsel from the subpoena requested records
8  from June 1, 2015, through September 30, 2015.
9  And the records we received, I'll represent to
10  you, are about 77 pages long.
11      Do you have an estimate, in your
12  opinion, of how many times Navient called you in
13  August 2015?
14    A.  After I told them to stop calling, I
15  would say it was at least 15 times.  I honestly
16  don't know.
17    Q.  Okay.  Are you aware that Navient
18  produced documents to your attorney in response
19  to written discovery requests in this case?
20    A.  I guess they did.  I don't know.
21    Q.  Have you reviewed any of the
22  documents Navient produced?
23    A.  I'm not sure which documents you're
24  speaking of.
25    Q.  Okay.  Are you aware that Navient

Page 58

1  gave your attorney a call log?
2    A.  No.
3    Q.  Okay.  So --
4    A.  I wasn't aware they gave anything to
5  him.
6    Q.  Okay.
7    A.  He told me they hadn't given him
8  anything.
9    Q.  So your attorney has not told you --
10      MR. HOEFFEL:  I'm going to object to
11  any of this.  That's kind of fishing for
12  privileged information.
13      MS. HAYWOOD:  I'm not looking for
14  privileged information.
15      MR. HOEFFEL:  Well, you're asking --
16  I think your last question was:  Did your
17  attorney tell you.  That's a privileged
18  conversation.
19      MS. HAYWOOD:  Whether you -- my
20  question is whether you provided our call log to
21  him.  That's not privileged.
22      MR. HOEFFEL:  That was your question
23  three questions ago.  So, I mean, you can ask
24  your next question, but...
25    Q.  (BY MS. HAYWOOD)  Okay.  Mr. Kovach,

Page 59

1  you've never reviewed Navient's call log?
2    A.  No.
3    Q.  I'll represent we produced a call
4  log to your counsel.  It's Bates labeled NSI34
5  to 36.  And what it does is it shows calls that
6  our client made to your cellular telephone
7  number ending in 5587, beginning August 1, 2015,
8  through the date you filed your complaint.  I'm
9  also going to represent to you it shows 30 calls
10  in the entire month of August, so that's
11  beginning August 1, 2015 -- well, it shows 30
12  calls from August 1, 2015, through the date you
13  filed your complaint, which was November 2016.
14      Does that comport with your
15  recollection, or are you thinking Navient made a
16  lot more calls than that?
17    A.  I don't know.  It seemed like a lot
18  more calls, but that's -- you know, I was being
19  harassed, so I was -- I wasn't sitting there
20  counting the calls.
21    Q.  Okay.  Right.  And you haven't had
22  the opportunity to review our call log, as we've
23  learned, right?
24    A.  No.
25    Q.  Okay.  And I'm going to represent to

Page 60

1  you as well that I reviewed your T-Mobile
2  records, and they, too, show Navient called you
3  exactly 30 times beginning August 1, 2015, and
4  continuing through September 30, 2015 -- yeah,
5  September 30, 2015.  So your client's records
6  and the T-Mobile records, in my opinion, match
7  up exactly, and they show 30 calls.
8      I'm also going to represent to you,
9  based on Navient's record, you didn't speak with
10  anyone until August of -- August 23, 2015.  Do
11  you have any reason to believe otherwise?
12    A.  I guess if that's what the records
13  say, that's what the records say.
14    Q.  Do you know what number Navient
15  called you from?
16    A.  I don't remember.
17    Q.  Okay.
18    A.  I don't remember when they started
19  calling me in person, too long ago.
20    Q.  I didn't hear what you said.  Would
21  you repeat that.
22    A.  It was too long ago.  I don't
23  remember when -- when they started calling me in
24  person.
25    Q.  Okay.  Is Navient still calling you?



Page 61

1    A.  No.
2    Q.  And when did they stop?
3    A.  I don't know.  They stopped, I
4  guess, in September of 2015.
5    Q.  Do you recall whether that was early
6  September or late September?
7    A.  I don't remember.
8    Q.  Okay.  Are you aware that Navient
9  produced recordings of telephone calls between
10 you and Navient in connection with this case?
11   A.  No.
12   Q.  So it's fair to say you haven't
13 listened to any of the recordings?
14   A.  No.
15   Q.  Have you, yourself, made any
16 recordings of calls between you and Navient?
17   A.  No.
18   Q.  Okay.  What I'd like to do is play a
19 recording for you.  Give me just a minute.
20       MS. HAYWOOD:  Can we go off the
21 record for just a second?
22       (A discussion was held off the
23 record.)
24       MS. HAYWOOD:  We can go back on.
25   Q.  (BY MS. HAYWOOD)  Okay.  Mr. Kovach,

Page 62

1  I'm going to play a recording from an electronic
2  file.  And for the record the file number ends
3  in 150824.  That's the last part of the file
4  name.  This is a recording that has been
5  produced to your counsel back in February.  And
6  I'll represent to you that this is a recording
7  of a call that took place on August the 24th,
8  2015.
9       I'm going to play this for you.  And
10 let me know if you can't hear it, and I'll try
11 to adjust the volume.  All right?
12   A.  All right.
13       (Recording playing.)
14       (Recording stopped.)
15   Q.  Okay.  Mr. Kovach, do you recall
16 participating in that phone call?
17   A.  I vaguely remember that phone call.
18   Q.  Is this the call in which you claim
19 you revoked consent for Navient to call you on
20 your cell phone?
21   A.  I think -- I thought it was.
22   Q.  Do you agree you never said, "Stop
23 calling me" during this call?
24   A.  What's that?
25   Q.  Do you agree you never said, "Stop

Page 63

1  calling me" during this call we just listened
2  to?
3    A.  I didn't hear anything say that, no.
4    Q.  Okay.  Did I hear correctly that you
5  also said, "I guess the calls will continue"?
6    A.  Yeah.
7    Q.  If you wanted to inform Navient to
8  stop calling you, why didn't you say stop
9  calling you?
10   A.  I was unaware that's all I had to
11 do.
12   Q.  Okay.  To the best of your
13 recollection, did calls continue on your cell
14 phone after this August 24 --
15   A.  Yes.
16   Q.  Okay.  Is it your position that
17 Navient owes you between 500 and 1,500 per call
18 for every call after this call?
19   A.  Yes.
20   Q.  Is there a specific instance you can
21 remember before August 24, 2015, when this call
22 took place that you had a similar conversation
23 with Navient?
24   A.  No.
25   Q.  Okay.  I'm going to play you another

Page 64

1  recording.  This one the file name ends with
2  150826.  This is another recording that we
3  produced to your counsel back in February.  Is
4  it a fair assumption that you have not listened
5  to this recording --
6    A.  No.
7    Q.  -- either?
8        Okay.  If you cannot hear it, let me
9  know, and I'll turn the volume up.  All right?
10   A.  (No response.)
11   Q.  Okay?
12   A.  Yeah.  Sorry.
13       (Recording playing.)
14       (Recording stopped.)
15   Q.  Okay.  Mr. Kovach, do you recall
16 participating in this call?
17   A.  I do remember that conversation.
18   Q.  And is this --
19   A.  Vaguely.
20   Q.  I'm sorry, I missed what you said.
21   A.  I do remember that conversation
22 vaguely.
23   Q.  Okay.  Is this the call you revoked
24 consent for Navient to call you on your cell
25 phone?

Page 65

1    A.   Yes, I believe so.
2    Q.   And this would have been, based on
3    your records, August 26?
4    A.   I guess that's when I did it, that's
5    what the records show.
6    Q.   Do you have any written notes --
7    A.   No.
8    Q.   -- on this particular call?  I
9    believe you said Navient already called you four
10   days times a day.
11   A.   Yes.
12   Q.   Was that based on your memory at the
13   time?
14   A.   Well, yeah, that's four times a day.
15   Q.   Okay.
16   A.   I mean, if that's what I said,
17   that's what they called.
18   Q.   So they would have called you three
19   times already that day --
20   A.   Yes.
21   Q.   -- and this would have been the
22   fourth one?
23   Okay.  Your statement, based on our
24   records, is that that recording was of the
25   fourth call that particular day on August 26,

Page 66

1    2015 --
2    A.   Yes.
3    Q.   Are you seeking then, I guess, 500
4    to $1,500 for calls after August 26, 2015?
5    A.   Yeah, I guess whenever -- the
6    last -- that would be the last time I revoked.
7    Q.   Now, when you say that was the last
8    time, was that the first time?
9    A.   I don't remember.  I asked them to
10   stop so many times, I don't remember.  They just
11   kept calling and calling.  Wouldn't give up.
12   Q.   Okay.  But we've just listened to
13   two recordings, right?
14   A.   Yeah.
15   Q.   And as I told you, our records show
16   you didn't actually speak with anyone in August
17   2015 up until that -- the 24th.
18   A.   Well, I guess -- I guess I revoked
19   on the 26th, and then they kept calling me after
20   that, so...
21   Q.   Okay.  And so your testimony is
22   Navient kept calling you after --
23   A.   Yes.
24   Q.   -- the recording we just listened to
25   on August the 26th?

Page 67

1    Okay.  Let's listen to one other
2    recording.  This one, for the record, the file
3    name ends with 0150827.  This is also a
4    recording that was produced to your counsel back
5    in February.  And am I safe to assume you have
6    not yet listened to this?
7    A.   No.
8    Q.   Okay.
9    (Recording playing.)
10   (Recording stopped.)
11   Q.   Do you recall participating in this
12   call?
13   A.   I don't remember that conversation,
14   no.  But if -- you know, you guys have the
15   recording, so...
16   Q.   Does it sound like your voice on the
17   phone?
18   A.   Yeah.  No, the voice, it's me.
19   Q.   And the other two as well, right?
20   A.   I sound very agitated.  What's that?
21   Q.   Your voice is on the other two
22   recordings I played as well?
23   A.   Yeah.  Uh-huh.
24   Q.   Did you say on this particular call,
25   "I'm going to tell you for the third time, do

Page 68

1    not call"?
2    A.   Yeah.
3    Q.   If this is the third time you told
4    Navient to stop calling, the first two
5    recordings you --
6    A.   Yeah, I heard it say it one time in
7    one of the recordings, but I didn't hear me in
8    the first recording, me telling them not to call
9    anymore.
10   Q.   So you're not claiming you revoked
11   on the first one on August 24?
12   A.   I didn't hear anything, no.  But
13   I -- you know, maybe I missed it.  Maybe it was
14   there at the very end, but I didn't hear it.
15   Q.   Should we go back and listen to it,
16   and clarify it?
17   A.   If you want.
18   Q.   I'm going to replay the recording
19   ending in 50824.  And, Mr. Kovach, you're going
20   to tell me whether your position is you revoked
21   your consent for Navient to call you on your
22   cellular telephone number during this particular
23   call.  All right?
24   A.   Okay.
25   (Recording playing.)



Page 69

1       (Recording stopped.)

2       A.   No, I didn't revoke consent on that

3   call.

4       Q.   Okay.

5       MR. HOEFFEL:  And I'm just going to

6   object.  Revocation of consent is a legal

7   conclusion.  You know, if you want to ask it's

8   his opinion whether or not he revoked consent,

9   that's one thing, but -- or if you want to ask a

10  particular thing that he said.  But the

11  revocation of consent is a legal conclusion, and

12  it's not Mr. Kovach's determination that

13  matters.

14      MS. HAYWOOD:  He's already answered

15  the question.

16      Q.   (BY MS. HAYWOOD)  Mr. Kovach, are

17  you seeking damages of 500 to 1,500 a call for

18  calls made after the recording we just listened

19  to?

20      A.   Well, yeah, I guess, but I didn't --

21  you know, I didn't say not to call, so, you

22  know --

23      Q.   Okay.

24      A.   -- they could still call.

25      Q.   Okay.  Understood.

Page 70

1       A.   Until I said the next day they're

2   not allowed to call, and they kept calling.

3       Q.   Mr. Kovach, correct me if I'm wrong,

4   I'm hearing you're claiming damages of 500 to

5   $1,500 a call starting from the second recording

6   we listened to?

7       A.   Uh-huh.  I guess so.

8       Q.   Right.  And that's the one on

9   August 26, 2015, correct?

10      A.   Yes.

11      Q.   Okay.  Do you recall on that

12  particular call you said something like, I will

13  be suing you or something along those lines?

14      A.   Yes.

15      Q.   Okay.  Did you retain counsel

16  immediately after that phone call?

17      A.   No.  Because I wasn't sure what to

18  do.

19      Q.   Okay.  When did you see that

20  television commercial for plaintiffs?

21      A.   I don't remember.

22      Q.   Do you recall whether it was in

23  August 2015?

24      A.   It was -- yeah, it would have been

25  around the end of August, probably.

Page 71

1       Q.   Would it have been before or after

2   you said, I will be suing you?

3       A.   It would have been after.

4       Q.   I see.  Okay.  And the firm you

5   retained is Kimmel & Silverman in Pennsylvania?

6       A.   Yes.

7       Q.   Is it your understanding that they

8   communicated with Navient on your behalf?

9       A.   Yes.

10      Q.   Do you have any understanding what

11  communications they might have had?

12      A.   No.

13      Q.   So -- okay.  Do you know when

14  specifically Kimmel & Silverman began

15  communicating with Navient on your behalf?

16      A.   No.

17      Q.   Is it your understanding that they

18  asked Navient to stop calling your cellular

19  telephone?

20      A.   Yes.

21      Q.   Do you have a rough estimate of when

22  that would have been?

23      A.   No.

24      Q.   If I told you they sent a letter on

25  August 31, 2015, would that sound accurate to

Page 72

1   you?

2       A.   Possibly.

3       Q.   Okay.

4       A.   I'm not sure.

5       Q.   Have they provided copies of

6   correspondence that they sent to Navient on your

7   behalf?

8       A.   Not that -- not besides the

9   interrogatories, other stuff like that, no.

10      Q.   Not besides what?

11      A.   The interrogatories.

12      Q.   The interrogatories?

13      A.   Interrogatories, excuse me.

14      Q.   So the interrogatories are the only

15  document you've received representing

16  communications between Kimmel & Silverman and

17  Navient?

18      A.   Yes.

19      Q.   Okay.  I think you said calls

20  continued after you told Navient to stop calling

21  on August 25 -- 26 --

22      A.   Yes.

23      Q.   Were those calls to your cell phone?

24      A.   Yes.

25      Q.   Were there also calls made to your



JOSEPH A. KOVACH                                        April 28, 2017
KOVACH vs NAVIENT SOLUTIONS                                  73–76

Page 73

1  home phone?
2      A.  Yes.
3      Q.  Do you have a rough estimate of how
4  many times Navient called your home phone after
5  August 26, 2015?
6      A.  I'd say about five or six times.
7      Q.  And what's your estimate of how many
8  times Navient called your cell phone after
9  August 26, 2015?
10     A.  I don't remember.  It was a lot.
11     Q.  Okay.  Is it possible that you're
12  confusing calls to your home phone to calls to
13  your cell phone?
14     A.  It's possible.  It's just a bunch
15  before --
16     Q.  Okay.
17     A.  -- I told them to stop calling,
18  which I'm sure I won't get anything for.
19     Q.  Right.
20     A.  I didn't tell them to stop.  I
21  didn't know that's what I had to do.
22     Q.  I understand.  You're still
23  getting calls though, right?
24     A.  No.
25     Q.  And that's on either your home phone

Page 74

1  or cell phone?
2      A.  No.
3      Q.  Do you know what an offer of
4  judgment is?
5      A.  What's that?
6      Q.  Do you know what an offer of
7  judgment is?
8      A.  Yes.
9      Q.  What is it?
10     A.  It's an offer that someone can give
11  you, and if you don't get that much in court,
12  you have to pay their costs.
13     Q.  Okay.  And are you aware that
14  Navient made an offer of judgment in this case?
15     A.  Yes.
16     Q.  And what's your understanding of the
17  offer that Navient made?
18     A.  That they low-balled me.
19     Q.  Do you know the number Navient gave
20  you?
21     A.  Yes.  3,000.
22     Q.  It was 3,001, does that sound
23  correct?
24     A.  Yes, excuse me.
25     Q.  And you rejected that offer?

Page 75

1      A.  Yes.
2      Q.  I'm going to read this to you real
3  quick.  I have it here.  Is this something that
4  Charlie read to you or your attorney read to
5  you?
6      A.  My attorney explained it to me
7  what --
8          MR. HOEFFEL:  I'm going to object,
9  since nobody knows what you're about to read.
10         MS. HAYWOOD:  I'm talking about the
11  offer of judgment.
12     Q.  (BY MS. HAYWOOD)  Did someone read
13  you the offer of judgment?
14     A.  No.  They told me what it is.  They
15  didn't read it to me.
16     Q.  I'll read parts of it to you.  And
17  it says, Pursuant to Rule 68 of the Federal
18  Civil Procedure, Defendant Navient Solutions,
19  LLC, f/k/a Navient Solutions, Inc., offers to
20  allow judgment to enter against it on Plaintiff
21  Joseph A. Kovach's complaint as follows:  1,
22  Judgment in favor of plaintiff and against NSL
23  in the amount of $3,001, which includes all
24  costs then accrued to date of the offer properly
25  awardable under the relevant statute, contract,

Page 76

1  or other authority, including but not limited to
2  Rule 68 of the Federal Rules of Civil Procedure.
3  This shall be the total amount to be paid by NSL
4  on account of any liability claimed in the
5  complaint, including all costs ensued, attorney
6  fees, otherwise recoverable in this action by
7  plaintiff.
8          This offer of judgment was made
9  February the 16th of 2017, and expired 14 days
10  after service.  You are aware the CPC authorizes
11  statutory damages of just 500 a call, right,
12  Mr. Kovach?
13     A.  Yes.
14     Q.  And even if the Court agrees that
15  you revoked consent on August 26, 2015, would it
16  surprise you to know that Navient's records and
17  T-Mobile records show just one phone call on
18  your cell phone on August 27, 2015?
19     A.  I don't remember that, but I guess
20  if that's what it is, it's what it is.
21     Q.  And you are aware if you don't -- if
22  Navient just made one phone call, the one on
23  August 27, 2015, that we listened to, the most
24  you can recover is $1,500, correct?
25     A.  Yeah.



Page 77

1      Q.   And you are aware if you don't
2   recover more than 3,001, you're going to be
3   responsible for Navient's fees, right?
4      A.   Yes.
5      Q.   So explain to me, if Navient made
6   just one phone call, how you're going to recover
7   more than $3,000 in this case?
8      A.   I guess I'm not going to.  I've
9   screwed myself.
10      Q.   I think you told me you're just
11   seeking statutory damages, right?
12      A.   I guess so, yeah.
13      Q.   What do you mean you guess so?
14      A.   I don't think I can do punitive
15   damages in this case.
16      Q.   Okay.
17      A.   But I don't know.
18      Q.   Well, there's no --
19      A.   I'm not an attorney, so, you know,
20   whatever they're suing for is whatever I can sue
21   for.
22      Q.   Well, these are your claims.  So
23   you're seeking statutory damages only, right?
24      A.   Yes.
25         MS. HAYWOOD:  Okay.  I don't have

Page 78

1   any further questions.
2         MR. HOEFFEL:  I have nothing.
3         MS. HAYWOOD:  Okay.  Mr. Kovach, I
4   think that's it for the day.
5         THE COURT REPORTER:  Reading and
6   signing?
7         MR. HOEFFEL:  No, we can waive that.
8         THE COURT REPORTER:  Counsel on the
9   phone, would you like copy of the transcript?
10         MR. HOEFFEL:  I would like just an
11   email, mini, and I do not need -- I don't know
12   if any exhibits were even entered or marked, but
13   I don't need the exhibits.
14         MS. HAYWOOD:  We have no exhibits.
15         THE COURT REPORTER:  Sir, can I get
16   your email address?
17         MR. HOEFFEL:  Sure.  J-h-o-e-f, as
18   in Frank, f, as in Frank, e-l@creditlaw.com.
19         THE COURT REPORTER:  Thank you.
20         MR. HOEFFEL:  Thank you.
21         (It was stipulated and agreed by
22   counsel, with the consent of the deponent, that
23   the reading and signing of the within deposition
24   is waived.)
25

Page 79

1         WHEREUPON, the within proceedings
2   were concluded at the approximate hour of
3   11:34 a.m. on April 28, 2017.

Page 80

1              C E R T I F I C A T I O N
2
3        I, Chandra L. Monis, Registered
4   Professional Reporter, appointed to take the
5   deposition of
6              JOSEPH A. KOVACH,
7   certify that before the deposition the deponent
8   was duly sworn to testify to the truth; that the
9   deposition was taken by me on April 28, 2017;
10   then reduced to typewritten form, by means of
11   computer-aided transcription; that the foregoing
12   is a true transcript of the questions asked,
13   testimony given, and proceedings had.
14        I further certify that I am not
15   related to any party herein or their counsel and
16   have no interest in the result of this matter.
17        IN WITNESS WHEREOF, I have hereunto
18   set my hand on July 3, 2017.
19
20         _Chandra L. Monis_
21         Chandra L. Monis
           Registered Professional Reporter
22
23
24
25

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Case No. 1:16-cv-02755-CMA-NYW

JOSEPH A. KOVACH

      Plaintiff,

v.

NAVIENT SOLUTIONS, LLC

      Defendant.

---

## OBJECTIONS TO PLAINTIFF'S NOTICE OF TAKING THE DEPOSITION OF NAVIENT SOLUTIONS, INC. THROUGH ITS DESIGNATED WITNESS(ES) PURSUANT TO FED. RULE CIV. P. 30(b)(6)

---

Defendant Navient Solutions, LLC f/k/a Navient Solutions, Inc. (**NSL**) submits its objections to Plaintiff Joseph A. Kovach (**Plaintiff**)'s Notice of Taking the Deposition of Navient Solutions Inc. through its Designated Witnesses Pursuant to Fed. Rule Civ. P. 30(b)(6).  The deposition is noticed for May 19, 2017 in Wilkes-Barre, Pennsylvania.

### I.    NSL Objects to Plaintiff's Topics

1. **Topic 1**:  NSL objects topic 1 is vague and ambiguous.  NSL cannot determine what Plaintiff means by "communications relating to Plaintiff." Communications with third parties are not relevant to any party's claims or defenses or reasonably calculated to lead to the discovery of admissible evidence.  This topic is also overbroad in time and scope.  The relevant time period related to Plaintiff's claim is August 1, 2015 to November 11, 2016, when Plaintiff filed his Complaint.  Subject to

and without waiving any objections, NSL will produce a witness to testify regarding (**1**) its communications with Plaintiff or his counsel (if any) from August 1, 2015 to August 27, 2015, when it ceased placing telephone calls to Plaintiff's cellular telephone number ending in 5587; and (**2**) the communications Plaintiff had with NSL via NSL's website on June 4, 2015, as evidenced by the documents bates-labeled NSI000011-000030.

2. **Topic 2**: NSL objects topic 2 is vague and ambiguous.  NSL cannot determine what Plaintiff means by "the relationship" between NSL and Plaintiff.  This topic is also overbroad in time and scope.  The relevant time period related to Plaintiff's claim is August 1, 2015 to August 27, 2015, when NSL ceased placing telephone calls to Plaintiff's cellular telephone number ending in 5587.  Subject to and without waiving any objections, NSL will produce a witness to testify on NSL's servicing of Plaintiff's two Stafford loans disbursed pursuant to the Federal Stafford Loan Master Promissory Note bates-labeled NSL00001-000011, during the time-period of August 1, 2015 through August 27, 2015.

3. **Topic 3**:      NSL objects topic 3 is vague and ambiguous.  NSL cannot determine what Plaintiff means by "notes and/or call logs relating to" Plaintiff.   This topic is also overbroad in time and scope.  The relevant time period related to Plaintiff's claim is August 1, 2015 to November 11, 2016, when Plaintiff filed his Complaint. Subject to and without waiving any objections, NSL will produce a witness to testify regarding the call log and notes it previously produced.

4. **Topic 4**:  NSL objects topic 4 is overbroad in time and scope, vague, ambiguous, and not seeks information not relevant, not reasonably calculated to lead to

2

the discovery of admissible evidence, and not proportional to the needs to the needs of the case. The relevant time period related to Plaintiff's claim is August 1, 2015 to November 11, 2016, when Plaintiff filed his complaint. Third party communications, with the exception of communications with Plaintiff's counsel during the relevant time-frame, have no bearing on the issues this case presents. Subject to and without waiving any objections, NSL will produce a witness to testify regarding the call log, notes, and correspondence it previously produced.

5. **Topic 5**:　　　NSL objects topic 5 is overbroad in time and scope, vague, ambiguous, and not seeks information not relevant, not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs to the needs of the case. The relevant time period related to Plaintiff's claim is August 1, 2015 to November 11, 2016, when Plaintiff filed his complaint. Third party communications, with the exception of communications with Plaintiff's counsel during the relevant time-frame, have no bearing on the issues this case presents. Subject to and without waiving any objections, NSL will produce a witness to testify regarding the call log, notes, and correspondence it previously produced.

6. **Topic 6**:　　　NSL objects topic 6 seeks information protected by the work product doctrine and attorney-client privilege. The term "investigation" is vague and ambiguous. Subject to and without waiving any objections, NSL will produce a witness to testify regarding the documents it previously produced.

7. **Topic 7**:　　　NSL objects topic 7 is vague and ambiguous. NSL does not know what Plaintiff means by "any and all other information." Subject to and without

3

waiving any objections, NSL will produce a witness to testify regarding the factual basis for its admissions, denials and affirmative defenses in its Answer.

8. **Topic 8**:        NSL objects topic 8 is vague and ambiguous.  NSL does not know what Plaintiff means by "any and all other information."  Subject to and without waiving any objections, NSL will produce a witness to testify regarding the factual basis for the affirmative defenses in its Answer.

9. **Topic 9**:        NSL objects topic 9 is unduly burdensome, vague, ambiguous, and overbroad in time and scope.  In addition, this topic seeks information not relevant, not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of this case.  In particular, in order to streamline discovery in this matter, NSL will agree, for purposes of this action only, to not contest that the calls to Plaintiff's cellular telephone number ending in 5587 during the relevant time period of August 1, 2015 to August 27, 2015 (as reflected in NSI000031-NSI000036) were made using an "automated telephone dialing system" as defined by the TCPA.  NSL's agreement to such a stipulation is specific to this litigation only, and shall not be used, or have any effect, in any other litigation or proceeding.   Accordingly, NSL requests to meet & confer on the specific form and language of such a stipulation.

10. **Topic 10**:        NSL objects topic 10 is unduly burdensome, vague, ambiguous, and overbroad in time and scope.  In addition, this topic seeks information not relevant, not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of this case.  In particular, in order to streamline discovery in this matter, NSL will agree, for purposes of this action only, to not contest

that the calls to Plaintiff's cellular telephone number ending in 5587 during the relevant time period of August 1, 2015 to August 27, 2015 (as reflected in NSI000031-NSI000036) were made using an "automated telephone dialing system" as defined by the TCPA.  NSL's agreement to such a stipulation is specific to this litigation only, and shall not be used, or have any effect, in any other litigation or proceeding.   Accordingly, NSL requests to meet & confer on the specific form and language of such a stipulation.

11. **Topic 11**:   NSL objects topic 11 is unduly burdensome, vague, ambiguous, and overbroad in time and scope.   Calls NSL made to any telephone number other than Plaintiff's cellular telephone number ending in 5587 are not at issue in this case.   In addition, this topic seeks information not relevant, not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of this case.  In particular, in order to streamline discovery in this matter, NSL will agree, for purposes of this action only, to not contest that the calls to Plaintiff's cellular telephone number ending in 5587 during the relevant time period of August 1, 2015 to August 27, 2015 (as reflected in NSI000031-NSI000036) were made using an "automated telephone dialing system" as defined by the TCPA.  NSL's agreement to such a stipulation is specific to this litigation only, and shall not be used, or have any effect, in any other litigation or proceeding.   Accordingly, NSL requests to meet & confer on the specific form and language of such a stipulation.

12. **Topic 12**:   NSL objects this topic is overbroad in time and scope, unduly burdensome, and seeks information not relevant, not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of this

case.  Plaintiff's Complaint raises one claim for violations of the TCPA.   NSL's "management, supervision and discipline" and the "management, supervision and discipline" of NSL's employees have no bearing on any issue this case presents.  In addition, the terms "management," "supervision" and "discipline" are vague and ambiguous.

13. **Topic 13**:   NSL objects topic 14 is overbroad, vague and ambiguous. NSL has no possible way to know what Plaintiff means by "any and all other information" and therefore cannot determine what this topic may encompass.  Subject to and without waiving any objections, NSL will produce a witness to testify regarding the documents it produced in this case and the factual basis for its admissions, denials and affirmative defenses.

14. **Topic 14**:   No objection.

15. **Topic 15**:   NSL objects topic 15 is overbroad, vague and ambiguous. NSL has no possible way to know what Plaintiff means by "documents relating to Plaintiff" and therefore cannot determine what this topic may encompass.  NSL has already produce all relevant, non-objectionable documents "relating to Plaintiff." Subject to and without waiving any objections, NSL will produce a witness to testify regarding the documents it produced in this case.

16. **Topic 16**:   NSL objects topic 16 is unduly burdensome, vague, ambiguous, and overbroad in time and scope.  Calls NSL made to any telephone number other than Plaintiff's cellular telephone number ending in 5587 are not at issue in this case.  Neither are calls (if any) any other entities may have made to Plaintiff.  In

addition, the relevant time period related to Plaintiff's claim is August 1, 2015 to November 11, 2016, when Plaintiff filed his Complaint. Subject to and without waiving any objections, NSL will produce a witness to testify regarding the call log, notes, and call recordings it produced in this case.

17. **Topic 17**: NSL objects topic 17 is overbroad in time and scope, unduly burdensome, and seeks information not relevant, not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of the case. In particular, the relevant time period related to Plaintiff's claim is August 1, 2015 to November 11, 2016, when Plaintiff filed his Complaint. "Conversations" NSL may have had with Plaintiff outside this time-frame, with the exception of calls in which Plaintiff consented to receive autodialed calls or revoked consent to receive autodialed calls, are not relevant or reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving any objections, NSL will produce a witness who can testify regarding the call log, notes, recordings and other documents it produced in this case as well as any other relevant instances in which Plaintiff consented to receiving autodialed calls or revoked consent to receive autodialed calls.

18. **Topic 18**: NSL objects topic 18 is unduly burdensome, vague, ambiguous, and overbroad in time and scope. The only calls at issue in this case are calls NSL made to Plaintiff's cellular telephone number ending in 5587 during the time-period of August 1, 2015 to August 27, 2015. NSL's telephone dialing system, software, call centers, and dialing methods in general are not relevant. In addition, this topic seeks information not relevant, not reasonably calculated to lead to the discovery of

7

admissible evidence, and not proportional to the needs of the case.  In particular, in order to streamline discovery in this matter, NSL will agree, for purposes of this action only, to not contest that the calls to Plaintiff's cellular telephone number ending in 5587 during the relevant time period of August 1, 2015 to August 27, 2015 (as reflected in NSI000031-NSI000036) were made using an "automated telephone dialing system" as defined by the TCPA.  NSL's agreement to such a stipulation is specific to this litigation only, and shall not be used, or have any effect, in any other litigation or proceeding.  Accordingly, NSL requests to meet & confer on the specific form and language of such a stipulation.

19. **Topic 19**:    NSL objects topic 19 is unduly burdensome, vague, ambiguous, and overbroad in time and scope.  The only calls at issue in this case are the calls NSL made to Plaintiff's cellular telephone number ending in 5587 during the time-period of August 1, 2015 to August 27, 2015.  In addition, this topic seeks information not relevant, not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of the case.  In particular, in order to streamline discovery in this matter, NSL will agree, for purposes of this action only, to not contest that the calls to Plaintiff's cellular telephone number ending in 5587 during the relevant time period of August 1, 2015 to August 27, 2015 (as reflected in NSI000031-NSI000036) were made using an "automated telephone dialing system" as defined by the TCPA.  NSL's agreement to such a stipulation is specific to this litigation only, and shall not be used, or have any effect, in any other litigation or proceeding.  Accordingly, NSL requests to meet & confer on the specific form and

8

language of such a stipulation.

20. **Topic 20**:   NSL objects topic 21 is unduly burdensome, vague, ambiguous, and overbroad in time and scope.   The time period relevant to Plaintiff's claim is August 1, 2015 through November 11, 2016, when Plaintiff filed his Complaint, though NSL did not make any calls to Plaintiff's cellular telephone number ending in 5587 after August 27, 2015.   In addition, this topic seeks information not relevant, not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of the case.   Subject to and without waiving any objections, NSL will produce a witness to testify regarding NSL's policies and procedures for complying with the TCPA during the time period of August 1, 2015 to August 27, 2015.

21. **Topic 21**:   NSL objects topic 21 is unduly burdensome, vague, ambiguous, and overbroad in time and scope.   The time period relevant to Plaintiff's claim is August 1, 2015 through November 11, 2016, when Plaintiff filed his Complaint, though NSL did not make any calls to Plaintiff's cellular telephone number ending in 5587 after August 27, 2015.   In addition, this topic seeks information not relevant, not reasonably calculated to lead to the discovery of admissible evidence, and not proportional to the needs of the case.   Subject to and without waiving any objections, NSL will produce a witness to testify regarding NSL's policies and procedures for complying with the TCPA during the time period of August 1, 2015 to August 27, 2015.

## II.   NSL Objects to Plaintiff's Request for Production of Documents

Plaintiff served 13 requests for production with his deposition notice.   The deposition notice is dated May 13, 2017 for a deposition on May 19, 2017, though

9

Plaintiff did not actually provide the deposition notice to NSL until May 16, 2017.   In addition, Plaintiff will be taking NSL's deposition telephonically.   The Magistrate ordered Plaintiff to produce all documents he intends to use as deposition exhibits by no later than close of business on May 16, 2017.   Requiring NSL to bring documents Plaintiff cannot use as exhibits in any event is unduly burdensome and harassing.   In addition, NSL has already responded to Plaintiff's requests for production, produced all non-objectionable, relevant documents in its possession, custody or control, and will testify regarding the documents it has produced.   Based on these objections, and in light of NSL's offer to stipulate, for purposes of this action only, NSL made all its calls to Plaintiff's cellular telephone number ending in 5587 during the relevant time period of August 1, 2015 to August 27, 2015 using an "automated telephone dialing system" as defined by the TCPA, NSL will not produce any additional documents.

Dated this 18th day of May, 2017.

s/ Taylor T. Haywood
Dennis N. Lueck, Jr. #44283
Taylor T. Haywood, #46664
**AKERMAN LLP**
1900 Sixteenth Street, Suite 1700
Denver, Colorado 80202
Telephone: (303) 260-7712
Fax: (303) 260-7714
Email:  dennis.lueck@akerman.com
Email:  taylor.haywood@akerman.com

Attorneys for Defendant Navient
Solutions, LLC, f/k/a Navient Solutions,
Inc.

## CERTIFICATE OF SERVICE

I certify on the 18th day of May, 2017, I served a true and correct copy of the foregoing **OBJECTIONS TO PLAINTIFF'S NOTICE OF TAKING THE DEPOSITION OF NAVIENT SOLUTIONS, INC. THROUGH ITS DESIGNATED WITNESS(ES) PURSUANT TO FED. RULE CIV. P. 30(b)(6)** via e-mail on the following:

Amy Lynn Bennecoff Ginsburg, Esq.
Joseph C. Hoeffel, Esq.
KIMMEL & SILVERMAN, P.C.
30 E. Butler Pike
Ambler, PA 19002
E-mail:  aginsburg@creditlaw.com

*Counsel for Plaintiff Joseph A. Kovach*

_s/ Toni Domres_____
Toni Domres

11

Andrew Reinhart

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

\* \* \* \* \* \* \* \*

\*

JOSEPH A. KOVACH,          \*

　　　Plaintiff          \*   Case No.

　　　vs.          \*   1:16-cv-02755-CMA-NYW

NAVIENT SOLUTIONS, INC., \*

　　　Defendant          \*

\* \* \* \* \* \* \* \*


DEPOSITION OF

ANDREW REINHART

May 19, 2017


Any reproduction of this transcript

is prohibited without authorization

by the certifying agency.

Movant's Appendix 42

Andrew Reinhart

Page 2

1                          DEPOSITION

2                              OF

3    ANDREW REINHART, taken on behalf of the Plaintiff

4    herein, pursuant to the Rules of Civil Procedure,

5    taken before me, the undersigned, Gregory S. Jones, a

6    Court Reporter and Notary Public in and for the

7    Commonwealth of Pennsylvania, at the offices of

8    Sargent's Court Reporting Service, Inc., 22 East Union

9    Street, Wilkes-Barre, Pennsylvania, on Friday, May 19,

10   2017, beginning at 10:06 a.m.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Movant's Appendix 43

Andrew Reinhart

Page 3

1                    A P P E A R A N C E S

2

3   JOSEPH C. HOEFFEL, ESQUIRE

4   Kimmel & Silverman, PC

5   30 East Butler Pike

6   Ambler, PA  19002

7      COUNSEL FOR PLAINTIFF

8      (Via telephone)

9

10   DENNIS N. LUECK, ESQUIRE

11   Akerman, LLP

12   1900 16th Street

13   Suite 1700

14   Denver, CO  80202

15      COUNSEL FOR DEFENDANT

16      (Via telephone)

17

18   PATRICK CHAING, ESQUIRE

19   2001 Edmund Halley Drive

20   Reston, VA  20191

21      COUNSEL FOR DEFENDANT

22

23

24

25

Movant's Appendix 44

Andrew Reinhart

```
                                                      Page 4
 1                     I N D E X

 2

 3   WITNESS: ANDREW REINHART

 4   EXAMINATION

 5      By Attorney Hoeffel               7 - 67

 6   CERTIFICATE                             69

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Movant's Appendix 45

Andrew Reinhart

```
                                                          Page 5
  1                            EXHIBIT PAGE

  2

  3                                                      PAGE

  4   NUMBER        DESCRIPTION                       IDENTIFIED

  5   Exhibit 1  Contact Information Update Form         21

  6   Exhibit 4  Call Log                                38

  7   Exhibit 5  Class Notes                             52

  8

  9

 10

 11

 12

 13

 14

 15

 16

 17

 18

 19

 20

 21

 22

 23

 24

 25
```

Movant's Appendix 46

Andrew Reinhart

```
                                                    Page 6
 1                      OBJECTION PAGE

 2

 3    ATTORNEY                                        PAGE

 4    Lueck        15, 17, 18, 18, 19, 19, 19, 20, 24, 24,

 5                 26, 28, 29, 30, 30, 31, 33, 34, 37, 38,

 6                 40, 42, 42, 46, 46, 49, 50, 57, 62, 63,

 7                 64, 64, 66

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Movant's Appendix 47

Andrew Reinhart

Page 7

1          S T I P U L A T I O N

2     ------------------------------------------------------

3     (It is hereby stipulated and agreed by and between

4     counsel for the respective parties that reading,

5     signing, sealing, certification and filing are waived;

6     and that all objections, except as to the form of the

7     question, are reserved until the time of trial.)

8     ------------------------------------------------------

9          P R O C E E D I N G S

10    ------------------------------------------------------

11                    ANDREW REINHART,

12    CALLED AS A WITNESS IN THE FOLLOWING PROCEEDING, AND

13    HAVING FIRST BEEN DULY SWORN, TESTIFIED AND SAID AS

14    FOLLOWS:

15                         ---

16                     EXAMINATION

17                         ---

18    BY ATTORNEY HOEFFEL:

19    Q. Mr. Reinhart, my name is Jake Hoeffel and I

20    represent the Plaintiff, Joseph Kovach, in this case.

21 How are you?

22    A. Good.

23    Q. Could you please identify yourself for the

24    record, spelling your last name?

25    A. Yes.  Andrew Reinhart, R-E-I-N-H-A-R-T.

Movant's Appendix 48

Andrew Reinhart

Page 8

1       Q. Thank you.

2   And before we start, I'd like to just go over

3       some instructions.  As you can see, in front of you is

4       the court reporter.  So the court reporter is writing

5       down exactly what transpires this morning.  And it's

6       our attempt to make the cleanest record.

7   So in doing so, I'd ask you --- and I'll try to

8       do the same thing --- that we speak with verbal words.

9       No uh-huhs or uh-uhs or nods of the head or shakes.

10  Do you understand that?

11      A. Yes.

12      Q. And then another thing that I haven't been able

13      to figure out if it's easier or harder because we're

14      over the telephone, but again, in order to have a

15      clean record, we should not talk over one another.

16  So I will ask a question.  I ask you to let me

17      ask the question fully before you answer, and I will

18      do the same thing to you.

19  Is that okay?

20      A. Yes.

21      Q. Okay.

22  If I ask you any question that causes for you to

23      estimate or anything like that --- well, one, I would

24      ask you not to guess at any answer.  And if you're

25      going to estimate for an answer, please let us know

Movant's Appendix 49

Andrew Reinhart

Page 9

1     that you're doing so before you answer.

2   Is that okay?

3     A. I understand.

4     Q. Another thing, if I say something or ask a

5     question that you're unsure of, instead of guessing at

6     what you think I am saying, please make sure you

7     understand or ask me to rephrase the question so that

8     we're all on the same page.

9   Okay?

10    A. Okay.

11    Q. And finally, we shouldn't be too long today, but

12    if you need a break at any point, you know, I'm more

13    than happy to take a break.  There's just --- if I've

14    asked a question and it's still outstanding, I would

15    ask you to answer that question before taking that

16    break.

17   Okay?

18    A. Yes.

19    Q. Okay.

20   And do you have any questions for me before we

21    start?

22    A. No, I do not.

23    Q. Okay.

24   Have you ever had your deposition taken before?

25    A. No.

Movant's Appendix 50

Andrew Reinhart

Page 10

1      Q. Okay.

2   And are you here to testify today as a

3      representative of Navient?

4      A. Yes.

5      Q. And what is your position at Navient?

6      A. I'm a senior account --- sorry, a senior account

7      analyst.

8      Q. Senior account analyst.

9   How long have you had that position?

10     A. I've been in my current position since February

11     of this year.

12     Q. Okay.

13  And what was your position before your current

14     position?

15     A. Previously I was a senior customer advocate in

16     the office of the customer advocate.

17     Q. And that was with Navient?

18     A. Yes.

19     Q. And how long did you hold that position?

20     A. Six years.

21     Q. Okay.

22  And did you work for Navient prior to that?

23     A. Yes, I did.

24     Q. And what was your position before that one?

25     A. I was a customer service representative for

Movant's Appendix 51

Andrew Reinhart

Page 11

1     approximately a year and a half, two years.

2     Q. Is that the title for someone that's on the phone

3     talking to Navient's customers?

4     A. That's correct, for inbound calls.

5     Q. Inbound to Navient?

6     A. Correct.

7     Q. And you had that position for a year and a half

8     or so?

9     A. That's correct.

10    Q. And did you work for Navient before that?

11    A. No, I did not.

12    Q. Okay.

13    So you've been with Navient for a little less

14    than ten years.

15    Is that correct?

16    A. Right around eight, eight years.

17    Q. Eight years?  Okay.

18    And as a senior account analyst --- can you

19    please describe that position?

20    A. Yes.  I'm tasked with reviewing complaints,

21    researching accounts, gathering documents and

22    rendering a servicing opinion on the account.

23    Q. When you say reviewing complaints, what does the

24    word complaint mean?

25    A. So that would be the --- I guess the legal

Movant's Appendix 52

Andrew Reinhart

Page 12

1      document that we would receive from ---.

2      Q. So when you say complaint, you mean an actual

3      complaint that was filed in federal court?

4      A. Correct, yes.

5      Q. Okay.

6   Do you review complaints that are more in-house,

7      like a customer makes a complaint to a rep?  Do you

8      review something like that?

9      A. No.

10      Q. Okay.

11   And do you only work on accounts that are in

12      pending litigation?

13   COURT REPORTER:

14   Sorry, there's another party trying to

15      join us.  I think that's what's going on.

16   ATTORNEY HOEFFEL:

17   All right.  I heard some whispering.

18   COURT REPORTER:

19   Yeah, that's someone from my office ---

20      this is the court reporter.  Apparently there's

21      someone --- is there another attorney that's trying to

22      join in?  My office is contacting me, telling me it's

23      somebody --- that's what's going on over here.  Hold

24      on.

25                                    ---

Movant's Appendix 53

Andrew Reinhart

1      (WHEREUPON, AN OFF RECORD DISCUSSION WAS HELD.)

2                                      ---

3   THE WITNESS:

4   Would you be able to restate your last

5       question?

6   ATTORNEY HOEFFEL:

7   Sure.  I think I can at least get close

8       to what I said.

9       BY ATTORNEY HOEFFEL:

10      Q. I think I asked, do you only review accounts that

11      are in pending litigation?

12      A. Pending litigation and potential litigation.

13      Q. Okay.

14  And are you familiar with the Telephone Consumer

15      Protection Act?

16      A. Yes.

17      Q. Okay.

18  And did you have any training on that act?

19      A. Could you be more specific?

20      Q. Sure.

21  You said that you're familiar with the TCPA.

22  Correct?

23      A. Correct.

24      Q. How did you become familiar with that?

25      A. When I worked in the office of the customer

Movant's Appendix 54

Andrew Reinhart

Page 14

1    advocate, we were trained on how to recognize and how

2    to update accounts when a customer no longer wished to

3    --- for us to contact them with an auto dial to their

4    cellphones.

5    Q. Have you received any such training since your

6    promotion to senior account analyst?

7    A. Not additional training, just more background

8    information.

9    Q. Okay.

10   And are you familiar with the Plaintiff's case

11   here, Mr. Kovach?

12   A. Yes, I am.

13   Q. And when did you become familiar with Mr.

14   Kovach's case?

15   A. I believe a week and a half, two weeks ago.

16   Q. Had you ever touched his file up until, I guess,

17   two weeks ago?

18   A. No, I --- no, I did not.

19   ATTORNEY LUECK:

20   Go ahead.

21   ATTORNEY HOEFFEL:

22   I'm sorry, did somebody say something?

23   ATTORNEY LUECK:

24   I tried to object, but my witness had

25   already talked over me.

Movant's Appendix 55

Andrew Reinhart

Page 15

1    ATTORNEY HOEFFEL:

2    Okay.  Is that Patrick or Dennis?

3    ATTORNEY LUECK:

4    This is Dennis.

5       BY ATTORNEY HOEFFEL:

6       Q. Now, are you familiar with how Navient makes

7       outbound calls to its customers?

8       A. Yes, I have a basic knowledge.

9       Q. And can you walk me through the process of how

10      Navient makes its outbound calls?

11   ATTORNEY LUECK:

12   Object to form.  Go ahead.

13      A. I have a basic understanding.  I know that they

14      use a couple different methods to call, one of them

15      being an auto dialer and then I know they do manual

16      calls.  But I'm not --- like I don't know the

17      specifics of how that system works.

18      BY ATTORNEY HOEFFEL:

19      Q. Are you familiar with the calls that were made to

20      Mr. Kovach in this matter?

21      A. Yes.

22      Q. Do you know how those calls were placed to him?

23   ATTORNEY LUECK:

24   I'm going to jump in here.  Jake, did

25      you have a chance to read the document that we sent

Movant's Appendix 56

Andrew Reinhart

Page 16

1    you yesterday?

2    ATTORNEY HOEFFEL:

3    The objections?

4    ATTORNEY LUECK:

5    Along with the offer to stipulate to

6       certain factual issues?

7    ATTORNEY HOEFFEL:

8    I didn't see that offer.

9    ATTORNEY LUECK:

10   It's within that document.

11   ATTORNEY HOEFFEL:

12   I have it open right here.

13   ATTORNEY LUECK:

14   Okay.

15   Do you want to jump off the record and

16      take a look at it and talk with me real quick?

17   ATTORNEY HOEFFEL:

18   Sure, we can go off the record.

19                              ---

20      (WHEREUPON, AN OFF RECORD DISCUSSION WAS HELD.)

21                              ---

22      BY ATTORNEY HOEFFEL:

23      Q. Mr. Reinhart, does Navient --- when they make an

24      outgoing call, is there a process in place to make

25      sure that Navient has the consent of the recipient of

Movant's Appendix 57

Andrew Reinhart

Page 17

1    that call to receive an auto dial call?

2  ATTORNEY LUECK:

3  Object to form.  But go ahead, Andrew.

4    A. We have a system in place to track whether or not

5    we have TCPA consent.

6    BY ATTORNEY HOEFFEL:

7    Q. Was the system used to call Mr. Kovach, was it

8    the ININ system?

9    A. Again, I'm not too familiar with our dialing

10   system, so I couldn't tell you.  Or I'm sorry, I don't

11   know.

12   Q. Okay.

13 You just testified that there is a setting or a

14   system in place to confirm whether or not Navient has

15   consent to dial.

16 Correct?

17   A. Yes.

18   Q. Could you explain that system a little in more

19   detail?

20   A. Sure.  It's built into our record keeping system.

21   We have the capacity to track on an individual account

22   basis, in that account, whether we have permission to

23   dial using an auto dialer to that consumer's

24   cellphone.

25   Q. And is it a formula of sorts?  So if you have

Movant's Appendix 58

Andrew Reinhart

Page 18

1    consent, the calls are auto dialed?

2  ATTORNEY LUECK:

3  Object to form, but go ahead.

4    A. My understanding is something will --- something

5    along those lines, yes.  I don't know how exactly the

6    interaction works between the record keeping system

7    and the dialer, but my understanding is that if we

8    have consent, then we will place auto dialed calls.

9    If we do not have consent, then we will not place auto

10   dialed calls.

11   BY ATTORNEY HOEFFEL:

12   Q. If you do not --- if Navient does not have

13   consent, do they place outgoing calls to a customer?

14 ATTORNEY LUECK:

15 Object to form, but go ahead, Andrew.

16   A. We would --- there would be a couple different

17   factors.  If the account was past due, if it was in

18   certain states.  There's a couple different factors,

19   but generally speaking, yes, we would continue to

20   call, but we would call in a manual dialing mode.

21 ATTORNEY HOEFFEL:

22 Okay.

23   BY ATTORNEY HOEFFEL:

24   Q. Do you know if --- or what's the terminology of

25   if Navient has consent to auto dial?

Andrew Reinhart

Page 19

1    ATTORNEY LUECK:

2    Object to form, but go ahead.

3       A. I'm sorry, I don't understand the question.

4    ATTORNEY HOEFFEL:

5    Sure.  It was a little confusing.

6       BY ATTORNEY HOEFFEL:

7       Q. Is there --- if Navient has consent to auto dial,

8       is the account marked with a Y or with a green flag or

9       something like that?

10   ATTORNEY LUECK:

11   Object to form, but go ahead.

12      A. Yes.  So if the account --- if we have consent,

13      it's designated with a Y and if we do not have

14      consent, the field is designated with an N.

15   ATTORNEY HOEFFEL:

16   Great.

17      BY ATTORNEY HOEFFEL:

18      Q. And who marks each account Y or N?

19   ATTORNEY LUECK:

20   Object to form.

21      A. Could you be more specific?

22      BY ATTORNEY HOEFFEL:

23      Q. How does an account get marked Y?

24      A. There's various ways that it can be marked with a

25      Y, either during a telephone conversation with the

Movant's Appendix 60

Andrew Reinhart

Page 20

1    customer where the customer provides us with consent

2    orally, and they can provide written consent.  They

3    can provide electronic consent through our website as

4    well.

5    Q. So are some of the updates to mark the account

6    with a Y, are some of them automatic and some of them

7    are manual?

8    A. I wouldn't say that they're automatic.  The

9    consumer would still have to indicate that he provided

10   us consent.  So then in a way he is actually updating

11   our system.

12   Q. Right.

13   So if a customer goes online and changes their

14   contact information and puts in a phone number, does

15   the system automatically mark that as Y?

16   A. The consumer would have the opportunity to opt

17   out.

18   Q. Okay.

19   A. And I believe there is a disclosure on there

20   stating that they can opt out.

21   Q. Do you know if that was in place when Mr. Kovach

22   was accessing his account online?

23   ATTORNEY LUECK:

24   Object to form, but go ahead.

25   A. Could you be more specific with a date?

Movant's Appendix 61

Andrew Reinhart

Page 21

1    ATTORNEY HOEFFEL:

2    If you give me one second.  Well,

3        actually, if you can turn to Exhibit N-1.

4                                    ---

5        (Whereupon, Navient Exhibit 1, Contact

6        Information Update Form, was marked for

7        identification.)

8                                    ---

9    ATTORNEY CHIANG:

10   This is Patrick.  I'm handing Exhibit

11       N-1 to the witness.

12   THE WITNESS:

13   Okay.  I have the exhibit in front of

14       me.

15       BY ATTORNEY HOEFFEL:

16       Q. On page two of this exhibit, it's marked as Bates

17       stamp 12.

18   Do you see that?

19       A. Yes.

20       Q. Is this a page where Mr. Kovach either updated

21       his phone or he submitted his phone number to Navient?

22       A. That is correct.

23       Q. And is there language below his cellphone box

24       entry about the TCPA?

25       A. There is a disclosure at the bottom.

Movant's Appendix 62

Andrew Reinhart

Page 22

1    Q. And was Mr. Kovach able to opt out of the

2    consent?

3    A. I'm just reading through it.  Yes, it has an

4    option at the bottom to change your phone consent

5    preference --- sorry, preferences.

6    Q. So that last --- it's not even punctuated, but

7    that last sentence you think was a chance for him to

8    opt out?

9    A. Yes.

10   Q. Okay.

11   Would that have been a link right there, that

12   sentence?

13   A. I believe it's a hyperlink, yes.

14   Q. Okay.

15   And in the bottom right of this document, do you

16   see a time stamp of June 4th, 2015?

17   Is that correct?

18   A. At 10:24 and 41 seconds in the morning.

19   Q. So it's your testimony that in June of 2014

20   (sic), there was a chance for any consumer to opt out

21   of such an auto dialing consent?

22   A. I'm not sure about 2014, but this is 2015.

23   Q. I'm sorry, I misspoke.

24   So in 2015, a customer could opt out?

25   A. Yes.

Movant's Appendix 63

Andrew Reinhart

Page 23

1    Q. Going back to the yes or no demarcation of an

2    account as it pertains to consent, you testified a few

3    ways that an account could be marked Y.

4  Correct?

5    A. Yes.

6    Q. Is it possible for an account to go from Y to N?

7    A. Yes.

8    Q. Could you explain to me --- well, let me back up.

9  How many different ways can an account go from Y

10   to N?

11   A. It would be in the same fashion that it can go

12   from N to Y.  We can either get written, oral, or it

13   could be electronic online.

14   Q. Okay.

15  If it's verbal, that would be mostly over the

16   telephone.

17  Is that correct?

18   A. Yes.

19   Q. In order --- I'm just talking about telephone

20   calls or verbal commands to go from Y to N.

21  Would an agent of Navient have to change the

22   consent from Y to N?

23   A. Yes.

24   Q. So Navient doesn't have technology that if some

25   system over the phone hears a customer saying don't

Movant's Appendix 64

Andrew Reinhart

Page 24

1    call or stop calling me, it doesn't automatically

2    switch from Y to N.

3  Is that correct?

4  ATTORNEY LUECK:

5  Object to form.  Go ahead.

6    A. That's correct.

7    BY ATTORNEY HOEFFEL:

8    Q. Okay.

9  And so the only way that after a verbal

10    revocation of consent is that the Navient agent would

11    have to make a manual switch from Y to N.

12  Correct?

13    A. That's correct.

14    Q. Okay.

15  During telephone calls, is there a script that

16    Navient's agents use to confirm consent?

17    A. Yes.

18    Q. Does it happen at the beginning of a call or the

19    end of a call?

20    A. It would be at the beginning of a call.

21    Q. How does that script go, do you know?

22  ATTORNEY LUECK:

23  Object to form.  Go ahead.

24    A. I'm sorry, I don't know the exact script.

25  ATTORNEPY HOEFFEL:

Movant's Appendix 65

Andrew Reinhart

Page 25

1   Okay.

2     BY ATTORNEY HOEFFEL:

3     Q. But it's your understanding that an agent is

4     supposed to confirm consent at the beginning of a call

5     with a consumer?

6     A. When a new phone number is provided.

7     Q. Okay.

8   So what do you mean when a new phone number is

9     provided?

10    A. So at the beginning of a phone call, if we have

11    prior consent on the phone number, we will not

12    re-confirm that consent.

13  However, if a consumer provides a new telephone

14    number or we do not have consent --- or I'm sorry, let

15    me back up.

16  If we --- if the consumer provides a new

17    telephone number, at that point in time we would read

18    them the script to confirm whether or not we have

19    consent.

20    Q. Okay.

21  Please correct me if I'm wrong, but if Navient

22    obtained a new phone number for a customer, the

23    subsequent telephone call would have that confirmation

24    language at the beginning of the call.

25  Is that correct?

Movant's Appendix 66

Andrew Reinhart

Page 26

1    ATTORNEY LUECK:

2    Object to form.  Go ahead.

3        A. I'm not sure on their --- exactly how they ---

4        like are you --- are you talking about like if we

5        found --- like if we couldn't contact a customer and

6        we found a new phone number for them, or if this was

7        something that the consumer had previously provided?

8        I'm not sure what you're asking.

9        BY ATTORNEY HOEFFEL:

10       Q. I was just trying to fully understand your

11       previous statement that --- and that was my

12       interpretation of it.  And I just wanted to know if

13       that was correct or not.

14   But I can rephrase.  If Navient obtains a

15       telephone number that they did not previously have for

16       that customer, is it your testimony that the next

17       telephone call between the parties, Navient would

18       confirm that they had consent?

19       A. Correct.  The representative would be prompted to

20       read the script.

21       Q. Okay.  Thank you.

22   Now, you testified a little earlier that you

23       reviewed Mr. Kovach's file roughly two weeks ago.

24   Is that correct?

25       A. Yes.

Movant's Appendix 67

Andrew Reinhart

1    Q. And did you --- or what did you do to review the

2    file?

3    A. I reviewed all the relevant material, the phone

4    calls, the actual system of records, our call logs,

5    and the correspondence history.

6    Q. And when you say phone calls, do you mean audio

7    recordings of those calls?

8    A. Yes, I apologize.  The telephone recordings.

9    Q. That's fine.

10   How many recordings did you listen to?

11   A. I'd say approximately five, five to ten.  I'm not

12   sure on an exact number.

13   Q. Okay.

14   Would you be surprised to hear that only three

15   audio recordings were produced in discovery?

16   A. No.

17   Q. Did you listen to audio recordings that were not

18   produced in discovery?

19   A. Yes.

20   Q. Do you know how many you listened to that were

21   not produced in discovery?

22   A. Again, somewhere between five and --- well, there

23   was the three that were produced and then after that,

24   between two and seven.  I don't know an exact number.

25   Some of them were just messages that were left.

Andrew Reinhart

Page 28

1      Q. Sure.

2    ATTORNEY HOEFFEL:

3    Dennis, I guess I'm going to make a

4       request that all those recordings that have not been

5       previously produced, be produced.

6    ATTORNEY LUECK:

7    We can take a look and see if there are

8       recordings in the relevant timeframe that haven't been

9       produced.  But my understanding is that everything

10      during the relevant timeframe has been produced.

11      Certainly I'd be happy to take a look at it, though.

12   ATTORNEY HOEFFEL:

13   Okay.

14      BY ATTORNEY HOEFFEL:

15      Q. While we're talking about audio recordings, Mr.

16      Reinhart, how --- what is Navient's policy on

17      recording telephone calls?

18   ATTORNEY LUECK:

19   Object to form.  Go ahead.

20      A. Could you specify a date range?

21      BY ATTORNEY HOEFFEL:

22      Q. How about the relevant date range of Mr. Kovach's

23      calls?

24      A. So all ---.

25   ATTORNEY LUECK:

Movant's Appendix 69

Andrew Reinhart

Page 29

1   I have to object.  Do you want to let

2       the witness know the relevant timeframe?  You and I

3       know it probably off the cuff, but ---.

4   ATTORNEY HOEFFEL:

5   Yeah.  It's pretty much August ---

6       August 2015.

7   ATTORNEY LUECK:

8   Thanks.

9       A. During that time --- well, sorry.  So we would

10      record all calls.

11      BY ATTORNEY HOEFFEL:

12      Q. Okay.

13  So what do you mean by all calls?

14      A. Every telephone interaction.

15      Q. What if --- all right.

16  What do you mean by telephone interaction?

17      A. Inbound or outbound calls.

18      Q. If Navient placed a call to a consumer and there

19      was never an answer to that call, would there be an

20      audio recording with that attempt?

21      A. I'm not sure if --- I know there's a record of

22      them in the call logs.  I'm not sure if it records

23      dead silence.

24      Q. How does a recording commence?  Does it happen

25      automatically?

Movant's Appendix 70

Andrew Reinhart

Page 30

1      A. Yes.

2      Q. Is there ever a point where Navient's agents hit

3      a record button to record a call?

4      A. No.

5      Q. Can Navient's agents stop a recording of a call?

6      A. No.

7      Q. Does Navient have a purge policy for audio

8      recordings?

9  ATTORNEY LUECK:

10  Object to form.  Go ahead.

11      A. Could you provide a timeframe, please?

12      BY ATTORNEY HOEFFEL:

13      Q. What is the current purge policy of Navient for

14      audio recording?

15      A. We do not purge calls.

16  ATTORNEY LUECK:

17  Object to form once again, but go ahead.

18      A. We do not purge calls.

19      BY ATTORNEY HOEFFEL:

20      Q. So currently all calls are archived?

21      A. That's correct.

22      Q. Okay.

23  And how long has that been the policy of Navient?

24      A. I'm not sure on an exact date.  I believe it was

25      sometime in 2012, 2013.

Movant's Appendix 71

Andrew Reinhart

Page 31

1      Q. Okay.

2    Do you know what the policy was prior to that?

3      A. No, I don't.

4      Q. Do you know how many calls were placed to Mr.

5      Kovach in this matter?

6    ATTORNEY LUECK:

7    Object to form.  Go ahead.

8      A. Could you provide a timeframe?

9      BY ATTORNEY HOEFFEL:

10     Q. August 1st, 2015 to August 31st.

11     A. I'm not sure on an exact number.  I'd have to

12     refer to the call logs.

13     Q. Okay.

14   Do you know if any calls were placed to a

15     landline associated with Mr. Kovach?

16     A. I'm not certain.

17     Q. Okay.

18   Were any calls manually dialed to Mr. Kovach?

19   ATTORNEY LUECK:

20   I think we already covered that one with

21     the stipulation, Counsel.

22   But go ahead and answer if you know.

23     A. I'd have to refer to the call logs, but I do not

24     believe so.

25   ATTORNEY HOEFFEL:

Movant's Appendix 72

Andrew Reinhart

1   Okay.

2       A. Again, for the relevant timeframe.

3   ATTORNEY HOEFFEL:

4   Right.

5       BY ATTORNEY HOEFFEL:

6       Q. You also testified earlier that in preparation of

7       your testimony today, you reviewed a call log and

8       other account history.

9   Is that correct?

10      A. Yes.

11      Q. And do you know if you reviewed anything that has

12      not been produced in discovery?

13      A. I'm sorry, could you rephrase that question?

14      Q. Sure.  Rephrase it or restate it?

15      A. Rephrase it.

16      Q. Do you know if you reviewed anything that was not

17      produced in discovery?

18  ATTORNEY LUECK:

19  I believe that we already just covered

20      that as well.  He said he listened to some audio

21      recordings.

22  ATTORNEY HOEFFEL:

23  Yeah.

24      BY ATTORNEY HOEFFEL:

25      Q. I was asking in addition to that, did you review

Movant's Appendix 73

Andrew Reinhart

Page 33

1    anything in paper form that was not produced in

2    discovery?

3    A. No.

4  ATTORNEY LUECK:

5  Okay.  Thanks.

6    BY ATTORNEY HOEFFEL:

7    Q. I'm sorry, Mr. Reinhart, did you --- did you

8    answer?

9    A. No was the answer.

10   Q. No was the answer.  Thank you.

11  Do Navient's agents receive training for their

12   job?

13  ATTORNEY LUECK:

14  Object to form.

15   A. Which agents?

16   BY ATTORNEY HOEFFEL:

17   Q. Yeah, I'm sorry for that.  I should have been

18   more specific.

19  The job of handling outbound and inbound calls to

20   customers, what are those people titled?

21  ATTORNEY LUECK:

22  Object to form.

23   A. We have various representatives in different

24   departments.  Could you be more specific?

25   BY ATTORNEY HOEFFEL:

Movant's Appendix 74

Andrew Reinhart

Page 34

1     Q. Well, I'm just trying to get a term that I can

2     use that relates to anybody that would talk to a

3     customer on the phone.  So any call representatives?

4     A. Collections.

5     Q. Do collection agents, do they receive training?

6     A. Yes.

7     Q. Are you familiar with the training that they

8     receive?

9     A. I have a general understanding of it.  I was

10    never in collections, so I don't know specifically how

11    they're trained.

12    Q. Okay.

13  Do you know if a new collection agent, somebody

14    that is a new hire at Navient, do they receive

15    training on the TCPA?

16    A. Yes, they do.

17    Q. Do they receive training on how to respond to a

18    revocation of consent by a customer?

19  ATTORNEY LUECK:

20  Object to form.  Go ahead.

21    A. Yes, they do.

22    BY ATTORNEY HOEFFEL:

23    Q. Do you know what that training is?

24    A. Again, I'm not sure on the specifics of the

25    training, but generally speaking, they're trained when

Movant's Appendix 75

Andrew Reinhart

Page 35

1     a consumer contacts them, when they understand it to

2     be the customer revoking consent, they're trained to

3     update the system and note the account.

4     Q. What do you mean by update the system?

5     A. The TCPA --- earlier we had discussed the

6     mechanism to track TCPA consent within the system.  So

7     they would update that from either a Y to an N or an N

8     to a Y.

9     Q. Okay.

10   If they -

11   ATTORNEY LUECK:

12   I was just going to jump in.  Do you

13     mind if I just take a very, very quick, like five-

14     minute break, hit the restroom quickly?

15   ATTORNEY HOEFFEL:

16   I don't mind at all.

17                              ---

18     (WHEREUPON, A SHORT BREAK WAS TAKEN.)

19                              ---

20     BY ATTORNEY HOEFFEL:

21     Q. Mr. Reinhart, before we took a break, I was

22     asking questions about training that a new agent, a

23     new collection agent receives once they start at

24     Navient.

25   My next question is how long does the training

Movant's Appendix 76

Andrew Reinhart

Page 36

1     process last for a new hire?

2     A. I don't know.

3     Q. Do you know if it's more than a day?

4     A. It's more than a day, yes.

5     Q. Is it more than one week?

6     A. Yes.

7     Q. Is it more than two weeks?

8     A. Yes.

9     Q. Is it more than a month?

10    A. I'm not sure.

11    Q. Okay.

12    Is there any kind of test given to a new hire at

13    the end of training?

14    A. I don't --- I'm not certain.

15    Q. Is it safe to assume that you're not certain what

16    would happen to an agent if they failed a test?

17    A. Correct.

18    Q. Okay.

19    Does a new hire that's going through training, do

20    they receive any kind of written materials during

21    training?

22    A. Either written or digital.  I'm not familiar with

23    the training process for collections.

24    Q. Does a --- switching gears a little bit, does an

25    existing collection representative receive ongoing

Movant's Appendix 77

Andrew Reinhart

Page 37

1    training?

2    A. They receive regular updates.

3    Q. Can you explain that a little more in more

4    detail?

5    A. So they're provided with changes to existing

6    policies, updates to the policies.

7    Q. How often would you say an existing agent

8    receives this continuing training?

9    A. It varies.  It really depends on just --- well,

10   I'm not certain what it really depends on.  But it

11   varies.  It can be daily, weekly, monthly.

12   Q. Do you know if there's ever a written test after

13   such a training?

14   A. Not that I'm aware of.

15   Q. Okay.

16   Does Navient have a policy on how many telephones

17   --- telephone calls can be placed to a customer in one

18   day?

19   ATTORNEY LUECK:

20   Object to form, but go ahead.

21   A. Not that I'm aware of.

22   BY ATTORNEY HOEFFEL:

23   Q. Does it have a policy on how many calls can be

24   placed to a customer during one week?

25   ATTORNEY LUECK:

Movant's Appendix 78

Andrew Reinhart

Page 38

1    Object to form again, but go ahead.

2       A. Not that I'm aware of.

3    ATTORNEY HOEFFEL:

4    Okay.  Can you --- can someone place

5       Exhibit N-4 in front of Mr. Reinhart?

6                              ---

7       (Whereupon, Navient Exhibit 4, Call Log,

8       was marked for identification.)

9                              ---

10   ATTORNEY CHAING:

11   I'm handing Exhibit N-4 to the witness.

12   ATTORNEY HOEFFEL:

13   Thank you.

14   THE WITNESS:

15   Okay.  Just bear with me here for a

16      second.  I have to organize this in a manner that I

17      can read it.

18   ATTORNEY HOEFFEL:

19   Sure.  I actually have it laid out in

20      front of me end to end.

21   THE WITNESS:

22   Okay.

23      BY ATTORNEY HOEFFEL:

24      Q. So starting on the page that's Bates stamped 31

25      in the right-hand --- bottom right-hand corner, do you

Movant's Appendix 79

Andrew Reinhart

Page 39

1    see that?

2    A. Yes, I do.

3    Q. Okay.

4  The column all the way over to the left, at the

5    top of that column, it reads campaign name.

6  Do you see that?

7    A. Yes, I do.

8    Q. What does that column mean? D

9  Do you know?

10   A. I don't.

11   Q. Okay.

12 Above where it says campaign name, it says

13   outbound.

14 Do you see that?

15   A. Yes.

16   Q. Does this --- this Exhibit N-4, is this a

17   compilation of only outbound calls to Mr. Kovach?

18   A. For the relevant timeframe, yes.

19   Q. Do you know if there were any inbound calls

20   during this timeframe from Mr. Kovach to Navient?

21   A. I'm uncertain whether there was or wasn't.

22   Q. If they would not be memorialized in this call

23   log, would there be another call log that would

24   memorialize such a call?

25 ATTORNEY LUECK:

Movant's Appendix 80

Andrew Reinhart

Page 40

1    Object to form, but go ahead.

2      A. There would be the same call log, but it would be

3      labeled inbound calls.

4      BY ATTORNEY HOEFFEL:

5      Q. Okay.

6    Well, I guess switching pages --- I don't know

7      how you have it in front of you, but now I'm moving

8      towards Bates stamp 32.

9      A. Yes, I have it.

10     Q. The column furthest to the left on that page

11     reads wrap up category.

12   Do you see that?

13     A. Yes.

14     Q. What is in that column?  What is that?

15     A. So that is the column that --- so let me back up.

16   So the call logs, when they --- when a consumer

17     calls in, that's automatically logged.  And then this

18     portion would be the portion that an agent, at the end

19     of the call, would memorialize or place in like a

20     summary of the call, basically their wrap up reason.

21   So for instance, if they called and nobody

22     answered, it would be no answer.

23     Q. Do you know what remote hang up means?

24     A. I'm not entirely sure what it is.  Again, I'm not

25     an expert on the dialing system.

Movant's Appendix 81

Andrew Reinhart

Page 41

1      Q. Okay.

2   If you go down most of the way --- it's actually

3      easier to count from the bottom, seven rows up from

4      the bottom in the same column, it reads third-party

5      un-callable.

6   Do you see that?

7      A. Yes.

8      Q. Do you know what that means?

9      A. No, I don't.

10      Q. Okay.

11   Do you know what answering machine un-callable

12      means right under that?

13      A. No, I don't.

14      Q. Do you know what SIT callable means right under

15      that?

16      A. No, I don't.  The only thing that I'm sure of on

17      this would be the no answer.  Other than that, I don't

18      --- again, I'm not familiar enough with the dialing

19      system to know what exactly everything means.

20      Q. Sure.

21   And you testified earlier that an agent --- this

22      is kind of an account note or a summary of what

23      happened during the phone call or the phone call

24      attempt.

25   Is that correct?

Movant's Appendix 82

Andrew Reinhart

Page 42

1     A. Correct.  So this is ---.

2   ATTORNEY LUECK:

3   Object to form.  Go ahead.

4     A. Yes, so this is one piece.  We'd have to refer to

5     --- to get a complete picture, we refer to the class

6     notes.

7   ATTORNEY HOEFFEL:

8   Okay.

9     BY ATTORNEY HOEFFEL:

10    Q. Just speaking about this wrap up category column,

11    does an agent have just free autonomy to write

12    whatever they want, or are there pre-loaded shorthand

13    notes?

14    A. They're ---.

15  ATTORNEY LUECK:

16  Object to form, but go ahead.

17    A. They're pre-loaded in a dropdown box.

18  ATTORNEY HOEFFEL:

19  Okay.

20    BY ATTORNEY HOEFFEL:

21    Q. Moving one column to the right at the top, the

22    column reads wrap up code.

23  Do you see that?

24    A. Correct.

25    Q. Do you know what this column means?

Movant's Appendix 83

Andrew Reinhart

Page 43

1      A. That's a subcategory of the column to the left.

2      Q. Okay.

3   Does that mean an agent --- for instance, the

4      top-most row, the agent, from a dropdown in wrap up

5      category, would put remote hang up.  And then the

6      column wrap up code gives it more detailed choices

7      based on what the agent selected in wrap up category?

8      A. Yes.

9      Q. Great.

10  Do you know what any of these entries mean

11     besides the no answer one?

12     A. No, I don't.

13     Q. Okay.

14  Moving over --- same page, over column to the

15     right, it reads calling mode.

16  Do you see that?

17     A. Yes.

18     Q. Do you know what that column denotes?

19  ATTORNEY LUECK:

20  Again, Counsel, I think we covered this

21     with the stipulation.  But Andrew, go ahead and

22     answer.

23     A. That would designate whether or not it was a call

24     made by an auto dialer or a manual call.

25     BY ATTORNEY HOEFFEL:

Movant's Appendix 84

Andrew Reinhart

Page 44

1    Q. What does the eight mean?

2    A. I'm not sure exactly what the eight and the one

3    mean.  I know that they are both auto dialed calls,

4    though.

5    Q. Okay.

6  And those numbers do go in that calling mode

7    column.

8  Right?  It's a little offset?

9    A. I'm not sure what you mean.

10    Q. In my version, the eights and the ones are not

11    directly under the words calling mode.  They're almost

12    closer to phone number.

13    A. They are under the calling mode column.

14    Q. Okay.  Thank you.

15  Going now to the next page, Bates stamp 33, I

16    believe, 33.

17  Are you there?

18    A. Yes, I am.

19    Q. Great.

20  The column furthest to the left reads agent ID.

21  Do you see that?

22    A. Yes.

23    Q. Do you know what this column entails?

24    A. Yes.

25    Q. Could you please tell me?

Movant's Appendix 85

Andrew Reinhart

Page 45

1     A. They are the employee codes that relate to the

2     individual employee.

3     Q. That was part of the communication?

4     A. Correct.

5     Q. Now, the majority of the entries are blank.

6  Is that correct?

7     A. Yes.

8     Q. Does that mean that there was not a connection?

9     A. I'm not sure.

10    Q. If you go down further below, halfway, there's

11    six entries.

12  Is that correct?

13    A. Do you mean six entries with the employee code?

14    Q. I do, yes.  So there's six different rows that

15    have ---

16    A. Yes.

17    Q. --- an agent ID in them.

18    A. Yes.

19    Q. What does it mean when one of these rows includes

20    an agent ID?

21    A. That would be the agent that was associated with

22    the outbound call.

23    Q. How does an agent become associated with an

24    outbound call?

25    A. The call was placed from their workstation.

Movant's Appendix 86

Andrew Reinhart

Page 46

1    Q. Now, is it true that the dialer placed the call

2    and there was a connection and the call was then sent

3    over to the agent?

4    ATTORNEY LUECK:

5    Object to form.  Go ahead.

6    A. Again, I'm not an expert on how the dialer system

7    exactly works, so I don't know.

8    BY ATTORNEY HOEFFEL:

9    Q. Well, you testified just I think two questions

10   ago that when there's an agent ID, it means that the

11   call was placed from the agent's work station.

12   Do you know that that is 100 percent correct,

13   that they placed the call?

14   ATTORNEY LUECK:

15   Object to form, but go ahead.

16   A. The calls are --- on this call log, the calls

17   were made by a dialer.  So the agent themselves are

18   not initiating the phone call.

19   BY ATTORNEY HOEFFEL:

20   Q. Okay.

21   If there's an agent ID included in this column,

22   does that mean that there was a connected call between

23   Navient and, in this case, Mr. Kovach?

24   A. I'd have to refer to the class notes to be

25   certain.

Movant's Appendix 87

Andrew Reinhart

Page 47

1      Q. Okay.

2   Moving, I think, four columns to the right, it

3      reads call placed time.

4   Do you see that?

5      A. Which page was that?

6      Q. Same page, 33.

7      A. Yes.

8      Q. So does that mean that was the time that the call

9      was placed from Navient to Mr. Kovach?

10     A. Yes.

11     Q. Okay.

12  And now, actually moving to the next page, Bates

13     stamp 34 ---.

14     A. Yes, I have it in front of me.

15     Q. The second column from the left reads call

16     connected time.

17  Do you see that?

18     A. Yes.

19     Q. And both of these entries include the date of

20     January 1st, 1970.

21  Is that correct?

22     A. That's the date in the column, yes.

23     Q. Is it correct that there's six entries that

24     actually include dates within the month of August 2015

25     and they include a time stamp as well?

Movant's Appendix 88

Andrew Reinhart

Page 48

1     A. Yes.

2     Q. And referencing back to the previous page, page

3        33, are all of these calls --- do they match up with

4        all of the calls that have an agent ID in them as

5        well?

6     A. Yes.

7     Q. Okay.

8  Moving a column --- well, actually, sorry.

9  Staying with this call connected time column, is

10       there ---?

11 ATTORNEY LUECK:

12 Page 34?

13 ATTORNEY HOEFFEL:

14 I'm on page 34, yes, second column from

15       the left, call connected time.

16    BY ATTORNEY HOEFFEL:

17    Q. If there is --- and I hate to use the word real

18       entry, but if there is an entry that shows an actual

19       date and time stamp, do you understand what that

20       means?

21    A. I'm not sure what you're asking.

22    Q. If there is an --- do you understand what I mean

23       when I say a real entry here?  So instead of the

24       January 1st, 1970 entry?

25    A. Correct.  So we're looking at ---?

Movant's Appendix 89

Andrew Reinhart

Page 49

1   ATTORNEY LUECK:

2   Object to form, but go ahead.

3       A. So we're looking at ---?

4   ATTORNEY LUECK:

5   I'm not sure where he's going.

6       A. We're looking at the dates in August?

7   ATTORNEY HOEFFEL:

8   Right.

9       BY ATTORNEY HOEFFEL:

10      Q. So the dates --- so the entries that include an

11      August 2015 date and have a date or a time stamp as

12      well, do you know if that means there was a connected

13      call between Navient and Mr. Kovach?

14      A. I would have to refer to the class notes.

15      Q. Okay.

16   Moving two more columns to the right on the same

17      page, we're on page 34, a column that reads length.

18   Do you see that?

19      A. Yes.

20      Q. Do you know what that column means?

21      A. That's the length in seconds that the call

22      lasted.

23      Q. Okay.

24   Now, the first row in this column reads 158.

25   Do you see that?

Movant's Appendix 90

Andrew Reinhart

Page 50

1     A. Yes.

2     Q. Now, referencing back to the other page, the

3     previous page 33, there's no agent ID associated with

4     this first call.

5  Is that correct?

6     A. Correct.

7     Q. And then back on page 34, in the call connected

8     time, it reads that January 1st, 1970 date.

9  Correct?

10    A. Yes.

11    Q. Do you believe that there was a connected call

12    between the parties on this call?

13    A. I would have ---.

14 ATTORNEY LUECK:

15 Object to form, but go ahead.

16    A. I'd have to refer to the class notes.

17 ATTORNEY HOEFFEL:

18 Okay.

19    BY ATTORNEY HOEFFEL:

20    Q. If there was --- well, strike that.

21 The next column going to the right reads CA

22    result or C-A R-E-S-U-L-T.

23 Do you see that?

24    A. Yes.

25    Q. Do you know what that column is?

Movant's Appendix 91

Andrew Reinhart

Page 51

1    A. No, I don't.

2    Q. Do you know what the title is?

3    A. No, I don't.

4    Q. The next five columns, both on page 34 and page

5    35, any entry in those columns either reads true or

6    false.

7  Do you see all of those?

8    A. Yes, I do.

9    Q. Do you know what those columns are?

10    A. No, I don't.

11    Q. Okay.

12  Going to the last page of this exhibit, it's

13    Bates stamped 36 ---.

14    A. Yes, I have it in front of me.

15    Q. There's a --- I think it's the only column here.

16    I think it's the one entitled CA detail.

17  Do you see that?

18    A. Yes, I do.

19    Q. Do you know what the entries in that column mean?

20    A. No, I don't.

21    Q. Okay.

22  If you can keep this exhibit, Exhibit 4, kind of

23    handy, and then also get Exhibit 5 in front of you,

24    please?

25                          ---

Movant's Appendix 92

Andrew Reinhart

Page 52

1      (Whereupon, Navient Exhibit 5, Class

2      Notes, was marked for identification.)

3                              ---

4    ATTORNEY CHAING:

5    I'm handing Exhibit N-5 to the witness.

6    ATTORNEY HOEFFEL:

7    Thank you.

8    THE WITNESS:

9    Okay.  I have it in front of me.

10     BY ATTORNEY HOEFFEL:

11     Q. Is this the class notes you spoke of?

12     A. Yes.

13     Q. Do you know why it is so heavily redacted?

14     A. The exhibits were prepared by counsel, so ---.

15   ATTORNEY LUECK:

16   I can represent to you for the record

17     that this is just outside of our relevant timeframe,

18     the first page that you're looking at there, so ---.

19   ATTORNEY HOEFFEL:

20   Okay.  Well, if everybody could turn to

21     page 39 ---.

22     BY ATTORNEY HOEFFEL:

23     Q. Mr. Reinhart, do you know why the entries on this

24     page have been redacted?

25     A. No.

Movant's Appendix 93

Andrew Reinhart

Page 53

1   Again, they were prepared by counsel, so I'm

2       unsure why they were redacted.

3       Q. Okay.

4   ATTORNEY LUECK:

5   I can make the same representation for

6       the record.  It's before August 1st, 2015.

7   ATTORNEY HOEFFEL:

8   Well, not on page 39.

9   ATTORNEY LUECK:

10  I'm looking at 39.  It begins on 8/3.

11      The redactions are before 8/1.

12  ATTORNEY HOEFFEL:

13  Well, I see a lot of redactions between

14      8/6 and 8/8 and then 8/8 and 8/10.

15  ATTORNEY LUECK:

16  I'm looking at the top of page --- the

17      benefit of redactions are for confidential and non-

18      public information.  Social Security numbers, things

19      of that nature, we've left the last four on that.

20  If you want to have a further

21      conversation about it, I'm happy to do that off the

22      record.

23  ATTORNEY HOEFFEL:

24  Sure.

25      BY ATTORNEY HOEFFEL:

Movant's Appendix 94

Andrew Reinhart

Page 54

1    Q. Mr. Reinhart, are you on page 39 of Exhibit N-5?

2    A. Yes, I am.

3    Q. Okay.

4  If we start at the --- if we start in the top

5    half of this page ---.

6  I guess my first question, are these two pages

7    two screens shown on one page?

8    A. Yes.

9    Q. Okay.

10  So in the top half, the first screen, there is an

11    entry dated August 6th, 2015.

12  Do you see that?

13    A. Yes.

14    Q. And so if we just walk through each column, the

15    first column, I believe, is the date.

16  Is that correct?

17    A. That's correct.

18    Q. And the second column reads system.

19  Is that correct?

20    A. Yes.

21    Q. And what does that mean?

22    A. That's the source of the entry.  So if it was

23    system generated, it would be system.  If it was some

24    other entity, it would designate whatever source it

25    was.

Movant's Appendix 95

Andrew Reinhart

Page 55

1     Q. Okay.

2  Moving to the column to the right, it reads

3     GD-00.

4  Do you see that?

5     A. Yes.

6     Q. Do you know what that is?

7     A. They're what they call correspondence codes.  So

8     for instance, if the system put it in, it's GD-00.

9     Q. Okay.

10  And in the next column it says call attempts.

11     Does that mean there was an outbound call placed to

12     Mr. Kovach?

13     A. Yes.

14     Q. All right.

15  And then in that next column, the number one with

16     an end parenthesis, does that denote something?

17     A. I'm unsure of the relevance of it or what it

18     means, rather.

19     Q. Okay.

20  And the next column, is that just the date again?

21     A. It appears to be so, yes.

22     Q. And then the next column, is that the time of the

23     call?

24     A. Bear with me for a moment.  I'm going to look

25     back at the call logs.

Movant's Appendix 96

Andrew Reinhart

Page 56

1      Q. Sure.

2      A. I'm not sure what that denotes.

3      Q. Because it doesn't have an exact corresponding

4      entry on the call log.

5   Correct?

6      A. Well, I was comparing it to the times on the call

7      log, which they don't look like they match.  So to me,

8      I wouldn't think that it would be the time.

9      Q. Right, right, right.  I understand.  Thank you.

10   And then the next column, it reads RN.

11   Do you see that?

12      A. Yes.

13      Q. Do you know what that means?

14      A. No, I don't.

15      Q. Okay.

16   And then if we stay on page 39, but go down to

17      the next screen, the next section, there's a bunch of

18      entries that look the same as the one we just went

19      through with the different dates and ---.

20   Do you see that?

21      A. Yes, I do.

22      Q. And in the last column that we just spoke of,

23      instead of RN, it reads --- there's entries that read

24      SN and then there's an entry that reads SZ.

25   Do you see those?

Movant's Appendix 97

Andrew Reinhart

Page 57

1     A. Yes, I do.

2     Q. Do you know what SN means?

3     A. No.

4     Q. Do you know what SZ means?

5     A. No.

6     Q. Okay.

7  And then there's a big space and then there's a

8     column furthest to the right that --- do you know what

9     that column is?

10    A. That's the --- so that looks to be a date column.

11    Q. But they're all a date after the other date

12    column.

13 Correct?

14    A. Yes.

15 ATTORNEY LUECK:

16 Object to form.  Go ahead.

17    A. Yes, they are.

18 ATTORNEY HOEFFEL:

19 Okay.

20    BY ATTORNEY HOEFFEL:

21    Q. And when you were testifying regarding Exhibit

22    N-4, a couple different times you stated that in order

23    to tell if a call was connected, you would have to

24    look at the class notes.

25 Is that correct?

Movant's Appendix 98

Andrew Reinhart

Page 58

1    A. Yes.

2    Q. Now going --- you know, N-5, page 39, where would

3    you look on this page to figure out whether or not a

4    call connected?

5    A. If a call connected, there would be notes by an

6    agent.  So I could see on these for the top section

7    and the bottom section, there was attempts made but

8    there was no contact.

9    Q. So to understand your testimony, there would have

10    to be account notes somewhere on this page to know if

11    a call connected.

12  Correct?

13    A. That and we would review --- to be certain, we

14    would have to refer to the audio recordings, but ---.

15    Q. Okay.

16  But there's no column that would have a little

17    code that would tell us that the call was answered or

18    connected?

19    A. I'm not sure.  Again, there's a couple

20    unidentified columns.  I don't know what they mean.

21    Q. Okay.

22  If you turn to page 41, please?

23    A. Yes, I'm on page 41.

24    Q. The first row underneath the top --- well, the

25    second redaction, it's dated 8/24/15.

Movant's Appendix 99

Andrew Reinhart

Page 59

1   Do you see that?

2       A. Yes, I do.

3       Q. Okay.

4   And earlier you testified that the left column is

5       the date and then the column in to the right is who is

6       making this entry.

7   Is that correct?

8       A. That's correct.

9       Q. So is this letter and number, C55369, is that

10      just an agent ID?

11      A. Yes.

12      Q. So is it telling us that a human made this entry

13      and not the system?

14      A. Yes.

15      Q. Okay.

16  And then skipping a column, it reads, B, refused

17      to be assisted, semi-colon, hang up.

18  Is that correct?

19      A. Yes.

20      Q. And who is making that note?

21      A. That would be the agent with the ID, C55369.

22      Q. Okay.

23  In making this note, do they have full autonomy

24      of what they can write?

25      A. Can you specify in which section?

Movant's Appendix 100

Andrew Reinhart

Page 60

1     Q. Sure.  The notes section that reads, B, refused

2     to be assisted, semi-colon, hang up?

3     A. Yes.

4     Q. Is there any kind of pre-loaded entries that they

5     can click on as well?

6     A. Not that they can click on.  The code to the

7     left, which I had referred to earlier, there's

8     specific codes that they can use that would autofill

9     certain things.

10    Q. Can you tell me what column to the left you're

11    testifying about?

12    A. Third column to the left.

13    Q. So the one that reads GD-00?

14    A. Correct.

15    Q. Okay.

16    But I thought that was the system that generated

17    that column.  Or that entry, sorry.

18    A. It's through the interface on the agent's desk

19    when they're writing notes.  For this collections

20    agent, it would be a GD-00.  Now, they can also

21    select, for instance, the next code, which is GD-57,

22    made by the same agent.  The agent selects this code,

23    GD-57, and then it auto-populates with phone RLMTCPM.

24    Q. All right.

25    A. So they're like shortcuts.

Movant's Appendix 101

Andrew Reinhart

Page 61

1      Q. Okay.

2  If you can turn back to --- within Exhibit 4,

3      it's Bates stamped 34.  But also keep Exhibit --- the

4      class notes around as well.

5      A. Okay.  I have both.

6      Q. Please.  Okay.

7  Talking about the length column, do you see that

8      on page 34?

9      A. Yes, I do.

10     Q. We talked about --- the first entry is a good

11     example, that it reads 158.

12  Do you see that?

13     A. Yes, I do.

14     Q. And I asked you earlier if you could tell whether

15     or not there was a connected call on that day, August

16     5th, and you said you'd have to refer to the class

17     notes to see if there was such a thing.

18     A. Correct.

19     Q. I guess my question is can you do that now?  Can

20     you look at the class notes and tell me whether or not

21     there was a connected call?

22     A. From the notes that I have in front of me, it

23     does not appear that there was a connected call.

24     Q. All right.

25  And actually, this might be a bad example because

Movant's Appendix 102

Andrew Reinhart

Page 62

1     there's no entry at all for August 5th on the --- in

2     the class notes.

3  So if we just go down two --- we're on page 34.

4     If we go down two rows, it's a call --- the call

5     disconnected time is August 6th, 2015 at 5:14 p.m.

6  Do you see that?

7     A. Yes, I do.

8     Q. And the length is 151?

9     A. Yes.

10     Q. Can you look at the class notes and see if there

11     was a connected call on August 6th, you know, sometime

12     around 5:00 p.m. or 5:15?

13     A. There was not.

14     Q. There was not a connected call?

15     A. No.

16     Q. Do you know why there would be these big lengths

17     in Exhibit 4, in that length column?  Do you know why

18     there would be long lengths if there was no connected

19     call?

20  ATTORNEY LUECK:

21  Object to form, but go ahead.

22     A. The timer starts when the call initiates.  So

23     that could just be, you know --- it's in seconds.  So

24     roughly three minutes.  It could be the ringing, the

25     answering machine, and then also it's the after call.

Movant's Appendix 103

Andrew Reinhart

1      So after the call is done, the agent is noting the

2      system, doing things like that.  That length includes

3      all of that.

4      BY ATTORNEY HOEFFEL:

5      Q. Okay.

6   Are you familiar with Navient --- I think this is

7      a Navient term, but sending out message blasts to

8      their customers?

9   ATTORNEY LUECK:

10   Object to form, but go ahead.

11      A. I'm not familiar with it, no.

12      BY ATTORNEY HOEFFEL:

13      Q. No?

14   Do you know if any automated messages were sent

15      to Mr. Kovach?

16      A. No, I don't know.

17      Q. Do you know what I mean by automated message?

18      A. Like a pre-recorded message?

19      Q. Yes.  So if Mr. Kovach were to open --- or sorry,

20      answer the phone, he would be met with a message and

21      no live representative would ever get on?

22      A. Uh-huh (yes).

23      Q. If such a message were sent to Mr. Kovach, would

24      it be included in the account notes or the call log,

25      Exhibit N-4?

Andrew Reinhart

Page 64

1    ATTORNEY LUECK:

2    Object to form, but go ahead.

3       A. I'm not sure if it would or not.  Again, I'm not

4       too familiar with the dialer and how that works.

5       BY ATTORNEY HOEFFEL:

6       Q. I understand.  I appreciate you answering honesty

7       --- or honestly.

8    The same question, if there was any message blast

9       or automated message sent to Mr. Kovach, would it be

10      included in the class notes, Exhibit N-5?

11      A. I'm unsure.

12   ATTORNEY LUECK:

13   Object, but go ahead.

14      A. That was --- I'm unsure.

15   ATTORNEY HOEFFEL:

16   Okay.  I would request just a two or

17      three-minute break.  I think I'm done, but I'd like to

18      look over everything.  Is that okay?

19   ATTORNEY LUECK:

20   Absolutely.

21                              ---

22      (WHEREUPON, A SHORT BREAK WAS TAKEN.)

23                              ---

24      BY ATTORNEY HOEFFEL:

25      Q. Mr. Reinhart, if we could go back to Exhibit N-5,

Movant's Appendix 105

Andrew Reinhart

Page 65

1      page 41?

2      A. Yes, I have it in front of me.

3      Q. Great.

4   We were just --- you just testified about the

5      first two rows of the top section.

6   Is that correct?

7      A. All right.

8      Q. And there was a connected call between the

9      parties.

10  Is that correct?

11     A. I'm sorry.  Refresh my memory once more.

12     Q. Was there a connected call between the parties?

13     Is that what this note shows?

14     A. On which date?

15     Q. The top row, August 24th, 2015.

16     A. Oh, yes.  Yes, there was.

17     Q. Besides this row --- and I believe the next row,

18     the second row, which reads phoned borrower, LMPCPM,

19     is there any other row that illustrates that call?

20     A. The 8/24 call?

21     Q. Correct.

22     A. No, it would just be those columns that were

23     previous --- or those rows that were previously

24     mentioned.

25     Q. Okay.

Movant's Appendix 106

Andrew Reinhart

Page 66

1   So the third row going down, also dated August

2       24, 2015, and the note section reads call attempts,

3       that doesn't correspond with the connected call that

4       is in the top two rows?

5       A. One of the --- the next row also reads a call

6       attempt.  So one of those call attempts would

7       correspond with that 8/24 call.

8       Q. Okay.

9       A. So the system would put in that call, then the

10      agent puts in notes afterwards.

11      Q. Okay.

12  So then moving still further down, there's an

13      entry on August 25th, 2015 and there are notes that

14      look to be from an agent.

15  Correct?

16      A. That's correct.

17      Q. And then is it your testimony that --- well,

18      actually, that same date, August 25th, there's no

19      system entry for that call.

20  Is that correct?

21      A. That is correct.

22  ATTORNEY LUECK:

23  Object to form, but go ahead.

24      BY ATTORNEY HOEFFEL:

25      Q. And the moving down to August 26th call, there's

Andrew Reinhart

Page 67

1      a note that reads phone borrower, LMTCPM.

2    Is that right?

3      A. That's correct.

4      Q. Do you know what the LMTCPM means?

5      A. I believe the LMTC is left message to call, but

6      I'm not 100 percent certain on it.

7      Q. Okay.

8    And do you know what the PM means?

9      A. No, I don't.

10     Q. And is it your understanding that one of the

11     system entries below that that are dated August 26th,

12     refers to that note that was left by an agent?

13     A. Correct.

14     Q. Okay.

15   ATTORNEY HOEFFEL:

16   All right.  I don't have anything

17     further.

18   ATTORNEY LUECK:

19   All right.  This is Dennis.  I don't

20     have anything further.

21   ATTORNEY HOEFFEL:

22   Can we go off the record?

23                         ---

24     (WHEREUPON, AN OFF RECORD DISCUSSION WAS HELD AND THE

25     RECORD WAS CONCLUDED.)

Andrew Reinhart

Page 68

1                                    ---

2                          *  *  *  *  *  *  *  *

3              DEPOSITION CONCLUDED AT 11:39 A.M.

4                          *  *  *  *  *  *  *  *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Movant's Appendix 109

Andrew Reinhart

Page 69

1     COMMONWEALTH OF PENNSYLVANIA  )

2     COUNTY OF LUZERNE             )

3                        CERTIFICATE

4   I, Gregory S. Jones, a Notary Public in and

5       for the Commonwealth of Pennsylvania, do hereby

6       certify:

7   That the witness whose testimony appears in

8       the foregoing deposition, was duly sworn by me on said

9       date, and that the transcribed deposition of said

10      witness is a true record of the testimony given by

11      said witness;

12  That the proceeding is herein recorded fully

13      and accurately;

14  That I am neither attorney nor counsel for,

15      nor related to any of the parties to the action in

16      which these depositions were taken, and further that I

17      am not a relative of any attorney or counsel employed

18      by the parties hereto, or financially interested in

19      this action.

20

21

22  Gregory S. Jones

23

24

25

Movant's Appendix 110

# Call Recording IRCall_14008991488015O528.wav*

*Call recording that will be filed conventionally with the Clerk's Office

# Call Recording IRCall_140086092160150826.wav*

*Call recording that will be filed conventionally with the Clerk's Office

# Call Recording IRCall_240009905260150827.wav*

*Call recording that will be filed conventionally with the Clerk's Office

# Call Recording IRCall_240009905260150827.wav*

*Call recording that will be filed conventionally with the Clerk's Office